2018 IL App (1st) 170123

FIRST DISTRICT
SECOND DIVISION
December 4, 2018

No. 1-17-0123

| THE PEOPLE OF THE STATE OF ILLINOIS | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 12 CR 14068 |
| | ) | |
| MICHAEL CARAGA, | ) | The Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Pucinski and Hyman concurred in the judgment and opinion.

## OPINION

¶ 1        Defendant Michael Caraga—along with co-defendants Bogdan Bozic, Nicholas Prittis, Jimmy Pililimis, and Artan Kollcaku[1]—participated in an organized scheme to commit mortgage fraud. In this scheme, a straw buyer would obtain a mortgage to buy property sold by Pililimis; the loan proceeds would be split primarily among the straw buyer, Prittis, and Bozic; and the buyer would later default on the loan. As part of the scheme, Caraga prepared the loan application for the straw buyer, using fraudulent income documentation provided by the straw buyer and Bozic. Unbeknownst to Caraga, Bozic, Prittis, and Kollcaku, the straw buyer in the transaction involved in this case was an undercover federal agent, and this transaction was part of a sting operation in which Pililimis was a cooperating witness in the federal investigation.

¶ 2        Following a bench trial, the trial court found Caraga guilty of (i) loan fraud (720 ILCS 5/17-10.6(d) (West 2012)), (ii) financial institution fraud (*id.* § 17-10.6(c)(2)), (iii) attempted

---

[1]Caraga was tried separately, and codefendants are not parties to this appeal. We adopt the parties' spelling of codefendants' names.

theft (*id.* §§ 8-4(a), 16-1(a)(1)), (iv) wire fraud (*id.* § 17-24(b)(2)), and (v) forgery (*id.* § 17-3(a)(2)). The trial court merged all other counts into the loan fraud count and sentenced Caraga to two years probation and 200 hours of community service. Caraga appeals his convictions asserting that (i) his co-conspirators' statements should have been inadmissible as hearsay because the State failed to prove that he agreed to participate in the conspiracy, (ii) the evidence was insufficient to establish his participation in the conspiracy, and (iii) evidence of other crimes should have been excluded. Finding no error, we affirm.

¶ 3                                I. BACKGROUND

¶ 4        The Department of Housing and Urban Development (HUD) Office of Inspector General (OIG) is responsible for investigating fraud and abuse in connection with HUD programs, including mortgage fraud involving Federal Housing Authority (FHA) loans. An FHA loan is a mortgage loan guaranteed by HUD. To receive an FHA insured loan, the borrower must (i) reside in the property as a primary residence, (ii) provide a 3.5% down payment, and (iii) obtain homeowner's hazard insurance. An FHA loan may only be obtained for an individual's primary residence and not for investment properties, such as a vacation home or a second home.

¶ 5        Mortgage fraud occurs when an individual intentionally provides false documentation or materially misrepresents information on a loan application in order to obtain a loan. Mortgage fraud may involve a straw buyer, *i.e.*, an individual with good credit who allows another to use his or her name and personal details (income, employment history, credit) to buy property and obtain a mortgage, but who does not intend to live in the property. Documents may also be falsified for straw buyers, such as creating employment history and exaggerating employment income, to obtain a larger loan. Mortgage fraud schemes involving straw buyers are illegal.

¶ 6    Here, the mortgage fraud scheme involved the following key players: Pililimis (seller—cooperating witness), Bozic (recruiter/orchestrator), Caraga (loan originator), Prittis (buyer's attorney), and Jim Breen (seller's attorney). Assistant Special Agent (ASA) Manuel Colin from HUD OIG acted as the undercover straw buyer, using the assumed name of "Manny Rodriquez." Guadelupe Chavez was the HUD OIG Special Agent In Charge (SA) of the mortgage fraud sting.

¶ 7    Pililimis bought, sold, and managed properties on the south side of Chicago. Pililimis was arrested on March 11, 2010, for mortgage fraud, following a state criminal investigation relating to a different mortgage fraud sting. After his arrest, Pililimis agreed to work as an informant on the fraud investigation in this case. Pililimis worked with investigators for about two years, developing a plan of action, which called for Pililimis to sell one of his properties to a straw buyer with the help of a loan officer, accountant, and recruiter. According to the plan, Pililimis would sell a four-unit rental building he owned at 5800 South Bishop in Chicago to Rodriguez acting as the straw buyer, who would apply for a mortgage on the property using falsified documents.

¶ 8    On November 2, 2010, the trial court granted a consensual overhear, allowing Pililimis to record his conversations during the mortgage sting. The consensual overhear was eventually extended to also include ASA Colin's undercover conversations. The consensual overhears spanned about two years and ended on the day of the straw buyer's closing—July 2, 2012. The recorded conversations initially involved Pililimis, Prittis, and Mike Rogers, a loan officer. From those recorded conversations, the following individuals were added to the consensual overhears: Bozic, Kollcaku (provided gift funds), Kim Goldsby (replacement loan officer), and Adrienne Crawford (replacement loan officer). Caraga was not part of the investigation in the beginning

and was added to the consensual overhear about a year and half into the investigation—in early 2012—when he became involved in the transaction.

¶ 9        In late December 2010 or early 2011, Pililimis approached Prittis about a potential residential real estate transaction. Pililimis wanted to make money to pay off his debts, including $110,000 he owed Prittis. Pililimis had experience putting real estate transactions together and would recruit straw buyers. Pililimis told Prittis that he had a straw buyer named "Manny Rodriguez," who was a contractor with very good credit. One of the first steps of this transaction was to secure a mortgage for Rodriguez to buy the property.

¶ 10        A loan originator, usually either on the telephone or during a face-to-face meeting, will discuss with a borrower the types of loans available and the various forms that are part of the loan application. A loan originator will also assist the buyer in completing the application. Prittis referred Pililimis to various loan originators to help Rodriguez obtain a loan. Before Caraga, Prittis referred Pililimis to a number of loan originators who, for various reasons, were unable to complete the transaction. Two of the loan originators had been involved in previous transactions with straw buyers.

¶ 11        Prittis eventually referred Pililimis to co-defendant Bozic, who had successfully completed transactions involving straw purchasers in the past. Prittis had known Bozic for about 12 years after meeting him during a real estate construction deal. In September 2011, Pililimis involved Bozic in the transaction, and from then on, Bozic controlled everything—every communication and every aspect of the deal.

¶ 12        In March 2012, Bozic began providing Rodriguez with fraudulent information to use in connection with the loan application. First, Bozic went to Chase Bank with Rodriquez to open a bank account, which Rodriguez opened using $50 provided by Bozic. Bozic also gave Rodriguez

(i) a fabricated profit and loss statement for a trucking business that Rodriguez allegedly operated as an independent contractor and (ii) a fabricated employment history, which included working at Mid-City Management and Stavros Foods, where, as Bozic knew, Rodriguez had never worked. Around that same time, Bozic informed Rodriguez that the loan would be transferred to his friends at a different bank, who were people Pililimis did not know, and that Pililimis would be paid for originating the deal, but cut out of the deal going forward.

¶ 13    Bozic brought Caraga, a loan officer working at Vista Financial Bancorp, Inc., into the transaction. Prittis had closed three or four prior transactions with Caraga during late 2011 and into 2012. Bozic was also part of those transactions, and straw buyers were used to purchase the properties. Each of the three or four earlier transactions also involved a joint venture agreement between Bozic and the seller side of the transaction, detailing how the parties would disburse the proceeds from the closing among themselves. Caraga was not involved in the joint venture agreements in any of the prior transactions in which he was involved nor was he present during any of the joint venture agreement discussions for this transaction. There was no evidence that Caraga knew the earlier transactions were fraudulent, and the State did not offer evidence establishing how Caraga was compensated in connection with the prior transactions.

¶ 14    Because an FHA loan requires a 3.5% down payment, Bozic arranged for Rodriguez to receive funds for the down payment as a gift. An individual may receive funds as a gift for a down payment, but the gift must be from either a blood relative or a fiancé, and the donor cannot expect repayment of the gift. On June 6, 2012, Rodriguez received money for the down payment from Kollcaku, purportedly as his cousin, but they were not related. The money was deposited

into Rodriguez's Chase account. Rodriguez had completed an application for a $270,019 FHA loan, and the purchase price was $275,000.[2]

¶ 15     On May 15, 2012, Rodriguez met Caraga for the first time at Vista Financial. The meeting was recorded as part of the consensual overhears, and Bozic was also present. Before this meeting, Bozic instructed Rodriguez to make sure he was familiar with his fabricated employment history and earnings. Bozic told Rodriguez that the information he gives must match the supporting documentation. During the face-to-face meeting between Caraga, Bozic, and Rodriguez, it was clear that Bozic and Caraga knew each other. In fact, at one point, Caraga said that he loved Bozic, and he was a "really good guy." When Rodriguez asked if Bozic and Caraga went way back, Caraga responded, "yeah." Caraga also mentioned that the loan processor was hungry for Bozic's business and liked the loan amounts.

¶ 16     Caraga went over the loan application in detail, and as expected, asked Rodriguez about his employment history. Caraga asked Rodriguez if the documents that he gave him were plagiarized or fake, and Rodriguez reassured him that they were not. Caraga explained that Vista Financial has an auditing department that calls and verifies information. Caraga elaborated that if the information on the loan application does not match, "before you know it, you have to answer to some questioning." Caraga continued that "they start going deeper, to see what else you have going on, and they will send out the Feds." Caraga followed up by stating that "as long as everything is legitimate up front when you get to me, it's smooth sailing." Caraga also commented that Rodriguez had a high credit score—789—almost perfect.

¶ 17     On page one of Rodriguez's loan application, the FHA box was selected for type of loan, and the primary residence box was checked. On page four of the application, the box "yes" was

---

[2]The $270,019 total loan amount consists of $265,375 of principal ($275,000 purchase price minus the required 3.5% down payment of $9625) plus private mortgage insurance of $4644.

checked in response to the following question: "Do you intend to occupy the property as your primary residence?" During the meeting, Caraga leaned slightly forward and lowered his voice as he began to talk about the residency requirement. In particular, Caraga stated:

"Now another thing uhm—just to let you know. I uh—you know with your previous guys, okay. I know they're not technically living in there, okay. But as far as the mortgage statement 'cause it comes to the house—*** Yeah, 'cause (inaudible) one of my clients did an address change—that freakin' *** Fu**in' next thing you know I got GMAC and my bank—they're calling me. *** Okay hey—what's going on? I thought he was living in this property. *** Yeah, uh—this address is 5800 South Bishop. Uh—just to let you know because they'll come and make me buy the loan back. *** And then we'll get problems. *** I'm not spending 300,000 dollars. *** So don't change the address—at all period, okay?"

¶ 18    Regarding the 3.5% down payment, Caraga confirmed with Rodriguez that he would be using gift money for the down payment. Caraga instructed Rodriguez to sign the loan authorization, but not date it, because Caraga would date it later. Caraga later dated the loan authorization using the wrong date. Joseph Messina, Vista Financial's owner, was listed as the loan originator on Rodriguez's loan application, and the completed loan application was transmitted electronically to PMAC Lending, which later approved the loan.

¶ 19    As the closing approached, Bozic explained the transaction in greater detail to Rodriguez, telling him that he would have an attorney at the closing because everything needed to be professional and clean. Bozic told Rodriguez that he, Pililimis, and another guy would split $35,000 from this transaction, and "15% goes to the guy at the bank who helped, like Mike, for a

processing fee." Bozic also explained to Rodriguez that he has three other brokers, but "Mike and Jason are one of the good guys, maybe too much talk, but working."

¶ 20 Before the closing, Prittis, Bozic, and Caraga went to dinner together as a social outing, and they did not discuss any business. Caraga was the first to leave the dinner, and Bozic left right after him telling Prittis that he needed "to take care of him." Prittis presumed Bozic meant that he was going to pay Caraga for successfully getting the loan.

¶ 21 On July 2, 2012, the day of the closing, about 30 to 40 law enforcement officials were present at the closing location. HUD OIG agents watched Caraga leave Vista Financial and followed him as he drove to the closing at the title company. SA Chavez arrived at the closing location at about 2:30 p.m. and conducted surveillance from the parking lot. During her surveillance, SA Chavez saw Caraga park his car in the parking lot and watched him walk inside the title company.

¶ 22 Rodriguez, Caraga, Bozic, Prittis, and Breen were all present in the closing room. Rebecca Hofsteadter, an employee for the closing company, was also present. Hofsteadter observed Caraga interacting with everyone in the room, and his participation was more than just an onlooker in the transaction. Caraga identified himself to Hofsteadter as the mortgage broker.

¶ 23 The closing was delayed because Bozic thought the homeowner's hazard insurance premium of $3135 was too high, and he threatened to cancel the deal if the cost was not reduced. Paying for the insurance is the buyer's obligation, but Rodriguez did not ask Caraga to get the insurance lowered. If the buyer pays less for the insurance, the buyer will have more funds available.

¶ 24 Caraga and Bozic left the closing room and went into in a room across the hall, and Prittis joined them shortly thereafter. Caraga called the insurance agency and was able to get the

insurance reduced to $2310 from $3135. Caraga, Bozic, and Prittis discussed whether to proceed with the transaction considering the insurance cost remained at about $2300. Prittis left the room and went back to the closing room. Bozic eventually acquiesced and agreed to close the deal.

¶ 25    After returning to the closing room, Prittis discussed with Breen the joint venture agreement that Breen drafted. The joint venture agreement stipulated how the seller's proceeds from the sale of the transaction would be distributed. Based on this joint venture agreement, Bozic would receive about $119,000-$120,000. Bozic would disburse funds from his share of the proceeds to Pililimis and Rodriguez and keep the rest. Because the joint venture agreement was illegal, Prittis wanted to keep it between him, Breen, and Bozic. According to Prittis, Caraga did not know about the joint venture agreement, his name was not on the agreement, and none of the proceeds from the agreement would be disbursed to Caraga.

¶ 26    While ASA Colin was in the closing room, he was communicating with SA Chavez through text messages and was instructed to let SA Chavez know when to enter and stop the closing. At 3:15 p.m., SA Chavez and about 10 to 15 agents entered the closing room, announced that they were federal agents, and stopped the closing. Caraga, Prittis, Breen, and Bozic were all in the closing room. Caraga was standing against a wall with nothing in his hands, and the others were gathered at the closing table.

¶ 27    The law enforcement officials seized HUD loan and closing documents from the closer's desk, the closing table, and a garbage can. After documents were seized, SA Chavez began interviewing people. During the interview with Caraga, he identified himself as "Moaeyad Ahmad."[3] Caraga told SA Chavez that his wife had dropped him off at the closing, and he was waiting for her to pick him up. Caraga also told SA Chavez that he knows Messina, Vista Financial's owner, and that Messina pays him $100 as a referral fee for each customer Caraga

---

[3]The parties stipulated that Moaeyad Ghazi Ahmad and Michael Caraga are the same individual.

sends to Vista Financial. When SA Chavez asked Caraga if he knew anyone at the closing, Caraga said he knew Breen (the seller's attorney). SA Chavez again asked Caraga who he knew at the closing, and what he was doing there. Caraga answered that he did not know anyone at the closing, and he was there just to make sure that the closing happened. SA Chavez admonished Caraga that lying to a federal agent was a felony. Caraga then stated that he only knew Prittis, but he had no involvement in the deal, did not know where the property was located, and did not know what was going on.

¶ 28      Caraga and co-defendants Bozic and Prittis were charged with (i) loan fraud, (ii) financial institution fraud, (iii) attempt theft, (iv) wire fraud, and (v) forgery. Co-defendant Kollcaku, the "cousin" who provided funds for the down payment, was charged with (i) loan fraud; (ii) wire fraud; and (iii) forgery. Caraga asked that his case be severed from his co-defendants, and he was tried separately. The bench trial extended over a period of months.

¶ 29      At trial, ASA Colin admitted that neither Bozic nor Prittis told him that Caraga knew the transaction was fraudulent. And ASA Colin never told Caraga that he, as Rodriguez, did not intend to use the property as his primary residence. In all of the transaction documents, ASA Colin did not see Caraga's name mentioned anywhere. Caraga's counsel elicited similar testimony from SA Chavez, who stated that at no point during the recorded conversations did Bozic or Prittis indicate that Caraga knew that the information provided to obtain the loan was false or that the loan was fraudulent.

¶ 30      Over an objection based on relevance, the State introduced evidence that Caraga was not a licensed loan originator when he completed Rodriguez's loan application and that he had a provisional loan originator license in 2004. Defense counsel argued that the status of Caraga's license was irrelevant because he was not charged with providing loan origination services

without a license. But the State argued that the evidence was relevant to establish Caraga's background in the mortgage industry and what Caraga did in his position at Vista Financial. In overruling the objection, the trial court explained that whether Caraga was licensed was relevant background information, and he would only consider it for that purpose.

¶ 31   The trial court found Caraga guilty on all five counts and, as noted, sentenced him to two years probation and 200 hours of community service. After the trial court denied Caraga's posttrial motions for reconsideration and for a new trial raising primarily insufficiency of the evidence claims, he timely appealed.

¶ 32                        II. ANALYSIS

¶ 33                   A. Participation in the Conspiracy

¶ 34   Caraga first claims that the trial court abused its discretion when it admitted into evidence hearsay testimony of his co-conspirators because (i) the State failed to prove that he agreed to participate in the conspiracy and (ii) the statements were made before his alleged involvement in the conspiracy.

¶ 35   The State acknowledges that Caraga preserved his objection to the admissibility of this evidence for our review, but asserts that the issue of whether Caraga agreed to participate in the conspiracy has been forfeited because Caraga failed to raise this claim in the trial court. But even if the State is technically correct, because Caraga's participation in the conspiracy was integral to determining whether the hearsay statements fall under the coconspirator exception, we elect to review this issue. *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2017 IL App (1st) 153300, ¶ 15 (forfeiture is a limitation on the parties, not the court).

¶ 36   The parties agree that we review a trial court's ruling regarding the admissibility of evidence using the highly deferential abuse of discretion standard. *People v. Peterson*, 2017 IL

120331, ¶ 125; *People v. Reese*, 2017 IL 120011, ¶ 75. We will not reverse a ruling on the admissibility of evidence unless the trial court's decision is arbitrary, fanciful, or unreasonable such that no reasonable person would agree with it. *Peterson*, 2017 IL 120331, ¶ 125.

¶ 37   A conspiracy is defined as an agreement to commit a criminal act or acts. *People v. Kliner*, 185 Ill. 2d 81, 138 (1998). To make a *prima facie* showing of a conspiracy, the State must establish that (i) two or more people intended to commit a crime, (ii) they engaged in a common plan to accomplish this goal, and (iii) an act or acts were done by one or more of them in furtherance of the conspiracy. 720 ILCS 5/8-2 (West 2012); *Kliner*, 185 Ill. 2d at 138; *People v. Batrez*, 334 Ill. App. 3d 772, 783 (2002).

¶ 38   Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted. Ill. R. Evid. 801(c) (eff. Jan. 1, 2011); *People v. Tenney*, 205 Ill. 2d 411, 432-33 (2002). Hearsay statements are generally inadmissible, unless the statements fall within an exception. *Tenney*, 205 Ill. 2d at 432-33. Federal and state rules of evidence except from the rule against hearsay a coconspirator's statement made during the course and in furtherance of the conspiracy. *Kliner*, 185 Ill. 2d at 141; *People v. Leach*, 2012 IL 111534, ¶ 80 n.2 (citing Fed. R. Evid. 801(d)(2); Ill. R. Evid. 801(d)(2) (eff. Jan. 1, 2011)). A co-conspirator's statement is not hearsay because the statement is not offered for the truth of the matter asserted by the speaker, but to demonstrate the existence of and the object of the conspiracy. *Leach*, 2012 IL 111534, ¶ 80 n.2. For a statement to be admissible under this exception, the statement must somehow further the conspiracy or contribute to the accomplishment of its goal. *Kliner*, 185 Ill. 2d at 141.

¶ 39   Before a co-conspirator's statement may be admitted into evidence, the State must make a *prima facie* showing that a conspiracy existed with independent proof of the conspiracy, *i.e.*, proof apart from the co-conspirator's statement sought to be admitted. *Coleman*, 399 Ill. App. 3d

at 1203; *Batrez*, 334 Ill. App. 3d at 783. Because a conspiracy is almost never susceptible of direct proof, it may be established from circumstantial evidence and inferences drawn from all the surrounding facts and circumstances, including the accused's own words and acts, coupled with commonsense knowledge of the behavior of persons in similar circumstances. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134 (1999); *Coleman*, 399 Ill. App. 3d at 1203; *People v. Spencer*, 2016 IL App (1st) 151254, ¶ 36; *People v. Leak*, 398 Ill. App. 3d 798, 826 (2010); *People v. Cook*, 352 Ill. App. 3d 108, 125 (2004). And a court is permitted to draw broad inferences from the circumstances, acts, and conduct of the parties because of the necessarily clandestine nature of conspiracies. *Batrez*, 334 Ill. App. 3d at 783-84.

¶ 40    Caraga challenges the admissibility of co-conspirator statements made outside of his presence or without his knowledge, claiming that the State failed to prove that he agreed to commit mortgage fraud and insists he was an "unknowing pawn" in the conspiracy. Caraga claims that, absent proof of his agreement to participate in the conspiracy, the statements of other participants were inadmissible under the co-conspirator's hearsay exception.

¶ 41    The record belies Caraga's claims that there was no evidence demonstrating that he agreed to be part of the mortgage fraud conspiracy. Although there is no direct evidence demonstrating that Caraga explicitly agreed to join the conspiracy, his involvement may be inferred from all the surrounding facts and circumstances, including his own acts and declarations. *Coleman*, 399 Ill. App. 3d at 1203; *Cook*, 352 Ill. App. 3d at 125.

¶ 42    Caraga claims that any mortgage broker could have been used to secure the loan, demonstrating that the mortgage broker role was not integral to the conspiracy, and emphasizes that a number of other mortgage brokers were, in fact, involved before him. But it is undisputed that once Bozic became involved in the scheme, the first mortgage broker he contacted was

Caraga. The trial court was entitled to draw the reasonable inference that Bozic knew Caraga would likely be able to secure the loan, and that inference was strengthened by Caraga's ability to secure a mortgage in the three prior transactions involving Bozic that also used a straw buyer. Moreover, two of the three mortgage brokers contacted before Caraga appeared to have experience securing loans using a straw buyer. Consequently, the co-conspirators did not randomly contact any mortgage broker; instead, they targeted mortgage brokers who had experience securing loans for straw buyers, which ultimately led Bozic to involve Caraga in this transaction.

¶ 43        Caraga also argues that he was merely advising Rodriguez not to change his address and had no idea that Rodriguez would not be living in the property. This claim is belied by the record. There is no question that Caraga knew about the primary residency requirement for an FHA loan, which is why, in a lowered voice, he instructed Rodriguez to never change his address, especially relating to the delivery of the bank's mortgage statements. If Caraga did not know or suspect that Rodriguez did not intend to occupy the residence, we find it unlikely that Caraga would have had this extended discussion with Rodriguez about the importance of never changing his address. Indeed, if Caraga had no idea that this was a sham transaction, he would naturally have presumed that the buyer would live in the property, given the residency requirement and Rodriguez's answers to the questions on the application. Moreover, Caraga referred to Bozic's "previous guys," stating that he knew they technically were not living in the property. Caraga also commented that one of his clients did an address change, which prompted the bank to call Caraga to ask what was going on with that mortgage, creating the risk of Caraga having to buy back the loan. From these statements, the trial court could reasonably infer that Caraga's instruction to Rodriguez not to change his address was an affirmative act on his behalf

not only demonstrating his involvement in the conspiracy, but moving the conspiracy forward because both Caraga and Bozic knew that an FHA loan would not be approved unless the buyer occupied the property.

¶ 44    Likewise, there is no merit to Caraga's claim that because Bozic and Prittis purposely excluded him from conversations about the joint venture agreement, and there was no evidence that he was told about the fraud and straw buyers in the three prior transactions, the State failed to prove his joinder in the conspiracy. The joint venture agreement was only one aspect of the conspiracy, and the State was not required to prove Caraga's participation in and knowledge of every aspect of the conspiracy. *Knaus v. Guidry*, 389 Ill. App. 3d 804, 824 (2009). Given the clandestine nature of conspiracies (see *Spencer*, 2016 IL App (1st) 151254, ¶ 36), as well as the likelihood that primary actors in the conspiracy, particularly those in a position to reap the lion's share of the profits, may not want lesser participants to be aware of the extent of the proceeds, the fact that Bozic and Prittis did not share with Caraga details about the illegal joint venture agreement does not contradict or disprove Caraga's agreement to secure a loan for their straw buyer. The same holds true for conversations that Bozic had with Rodriguez outside of Caraga's presence, including those before and during the face-to-face meeting at Vista Financial.

¶ 45    Contrary to Caraga's position, the evidence in the record clearly establishes that Caraga knew his role in the mortgage scheme was to ensure that Rodriguez's loan was approved by PMAC. Because Caraga was an experienced mortgage broker, he knew what information was necessary to complete the loan application and to make it appear legitimate. Caraga argues that he did not know the application was fraudulent because when he asked Rodriguez and Bozic if the information was plagiarized, they reassured him that the information was correct. But when Caraga's statements are considered in context, the reasonable inference is that Caraga wanted

reassurance that the information Rodriguez and Bozic provided would not raise any red flags with the audit department and bank and potentially result in Caraga having to buy back the loan. See *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60 (the trier of fact is not required to ignore reasonable inferences that flow from the evidence). In any event, whether Caraga knew that the documents used to prepare the loan application were false was largely irrelevant because the evidence in the record demonstrated that Caraga knew Rodriguez would not be living in the property, which was fraudulent in itself for FHA loans.

¶ 46    Moreover, Caraga repeatedly interacted with Bozic by treating him, and not Rodriguez, as the true buyer—requesting information directly from Bozic, lowering the homeowner's insurance premium based on Bozic's displeasure, and waiting for Bozic's approval to continue with the closing after successfully negotiating a premium reduction. The fact that Caraga acted as any mortgage broker would in a legitimate transaction and explained the loan application process to Rodriguez has no bearing on whether Caraga agreed to participate in this conspiracy. Like the actors in many conspiracies, those involved here strived to keep up the appearance of a legitimate transaction. Indeed, Bozic told Rodriguez multiple times that everything had to be clean and professional.

¶ 47    Caraga's knowledge of the conspiracy and agreement to participate were also evident from his statements during and immediately following the raid. In response to SA Chavez's repeated questioning, Caraga denied knowing anyone at the closing apart from Prittis, the buyer's attorney. The record belies Caraga's statement. When Caraga had the face-to-face meeting with Rodriguez and Bozic, the nature of the conversation between Caraga and Bozic established that they had known each other for some time. Caraga even went so far as to tell Rodriguez that he loved Bozic and that he was a "really good guy." And before the closing,

Caraga, Bozic, and Prittis dined socially, which demonstrated a pre-existing relationship among these co-conspirators. Likewise, during the closing, Caraga interacted with everyone in the room and was not, as he told SA Chavez, just an observer. Caraga also falsely told SA Chavez that his wife dropped him off and that he was waiting to get a ride from her after the closing.

¶ 48    Most important, when the federal agents stopped the closing, Caraga denied any involvement and proclaimed his innocence, asserting that he was only there to ensure that the transaction closed and that he would only receive a $100 referral fee for sending customers to Vista Financial. Such attempts to deflect the focus of the investigation and cover up the crime demonstrate a consciousness of guilt. *People v. McCullough*, 2015 IL App (2d) 121364, ¶ 94 (citing *People v. Ehlert*, 211 Ill. 2d 192, 240 (2004)). We also cannot overlook Caraga's statements during the face-to-face meeting at Vista Financial, which revealed that he was aware that the "Feds" would act and get involved in fraudulent mortgage schemes. Thus, it was no surprise that when the federal agents stopped the closing, Caraga proclaimed no involvement in the fraudulent transaction.

¶ 49    Caraga's words and actions demonstrated that he knew about the mortgage fraud conspiracy and he agreed to become part of the conspiracy when he completed the loan application for Rodriguez. Moreover, Caraga's involvement in the conspiracy exceeded mere knowledge of or acquiescence in an illegal act. *People v. Darnell*, 214 Ill. App. 3d 345, 361 (1990). Consequently, the State proved by a preponderance of independent evidence that Caraga was a member of the mortgage fraud conspiracy.

¶ 50    Having established Caraga's agreement to be part of the conspiracy, we next consider whether Caraga's co-conspirators' statements were admissible under the co-conspirator's hearsay exception. Caraga challenges the admissibility of the following statements on the ground

that they were made before his involvement in the conspiracy: (i) Pililimis admitting his involvement in a prior mortgage fraud transaction, which lead to this undercover operation, (ii) Bozic informing Rodriguez that Pililimis would be paid, but cut out going forward, and (iii) Bozic's statement to Rodriguez that it was not necessary for him to contact the new banker. Caraga does not challenge the coconspirators' statements made after Caraga agreed to participate in the scheme and given our conclusion that the State proved Caraga's participation in the conspiracy, those statements clearly fall under the coconspirator's hearsay exception.

Contrary to Caraga's claim, coconspirator statements made outside of a defendant's presence or before the defendant agrees to participate in the illicit transaction are admissible under the co-conspirator's exception. See *People v. Davis*, 46 Ill. 2d 554, 557-58 (1970) (conversation regarding the potential purchase of narcotics prior to the defendant's arrival at the scene was admissible under the co-conspirator exception); *People v. Lake*, 297 Ill. App. 3d 454, 461-62 (1998) (coconspirator statements made before the defendant arrived at the scene and without his knowledge of the conversation or events preceding it were admissible under the co-conspirator exception). Moreover, the challenged coconspirator statements were made in furtherance of and during the pendency of the conspiracy. Likewise, Pililimis's statements to SA Chavez, admitting his participation in another mortgage fraud transaction, were properly admitted because the statements explained SA Chavez's later course of conduct of investigating the transaction involving Pililimis and Prittis, which is not hearsay. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 76. For that same reason, we disagree with Caraga that Pililimis's involvement in this conspiracy should have been entirely excluded. Pililimis was a key player in the mortgage scheme, and his conduct and interactions with the other co-conspirators further developed and were a necessary component of the conspiracy. Consequently, the trial court did

not abuse its discretion by admitting the challenged hearsay statements under the co-conspirator exception.

¶ 51                                      B. Accountability

¶ 52        Caraga next claims that the evidence was insufficient to convict him of loan fraud, financial institution fraud, and attempted theft on a theory of accountability because there was no evidence that he had any intent to aid and abet the conspirators in the mortgage fraud scheme.

¶ 53        A defendant is legally accountable for the conduct of another if "either before or during the commission of an offense, and with the *intent* to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." (Emphasis added.) 720 ILCS 5/5-2(c) (West 2012); *People v. Dennis*, 181 Ill. 2d 87, 96 (1998). To establish the requisite intent, the State must demonstrate that either (i) the defendant shared the principal's criminal intent or (ii) there was a common criminal design among the co-defendants. *People v. Fernandez*, 2014 IL 115527, ¶ 13. Here, the common-design element is relevant.

¶ 54        Under the common-design rule, if "two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *People v. Cooper*, 194 Ill. 2d 419, 434-35 (2000). Proof of the common purpose or design need not be supported by words of agreement, but may be inferred from the circumstances surrounding the commission of an act by a group. *People v. Perez*, 189 Ill. 2d 254, 266 (2000); *In re W.C.*, 167 Ill. 2d 307, 338 (1995). Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of the criminal design supports an inference that the group shared the common purpose and will

sustain the defendant's conviction for an offense committed by another. *Perez*, 189 Ill. 2d at 267; *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶ 34. But a defendant's mere presence at the scene, even with knowledge of an offense being committed, is not sufficient to render him accountable for the offense. *Cooper*, 194 Ill. 2d at 434.

¶ 55     When reviewing a sufficiency of the evidence claim, the appropriate inquiry is whether, after viewing the evidence in the light most favorable to the State, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis added.) *People v. Gray*, 2017 IL 120958, ¶ 35 (quoting *People v. Belknap*, 2014 IL 117094, ¶ 67, quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In other words, a reviewing court will reverse a conviction only if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Gray*, 2017 IL 120958, ¶ 35.

¶ 56     We find that there was sufficient evidence demonstrating Caraga's intent to aid and abet his co-conspirators in accomplishing the mortgage fraud. It cannot be disputed that there was a common design to engage in mortgage fraud; Bozic, Prittis, and Caraga all worked toward the common goal of closing a real estate transaction using Rodriguez as a straw buyer of a property sold by Pililimis. Importantly, without a mortgage for the straw buyer to purchase the property, the object of the conspiracy would fail. Thus, although Bozic, and not Caraga, orchestrated the fraudulent mortgage scheme, Caraga became an integral part of the common design when he agreed to usher Rodriguez through the loan application process.

¶ 57     Caraga largely reiterates the same bases here that he offered to support his claim that he never agreed to participate in the conspiracy—he was reassured that the documents used to complete the application were legitimate, the State did not prove that he knew the three or four

prior transactions involving Bozic and Prittis were fraudulent, and Bozic and Prittis hid the fraudulent nature of this transaction from him. But those assertions provide even less support for Caraga's claim that he did not intend to aid and abet the mortgage fraud because he took affirmative steps to complete and submit Rodriguez's fraudulent loan application to PMAC for its approval. See *In re W.C.*, 167 Ill. 2d at 338 (accountability may be established by an individual's knowledge of and participation in the criminal scheme, even in the absence of evidence that he directly participated in the criminal act). And all of the reasonable inferences to be drawn from the evidence introduced at trial discussed above likewise support Caraga's guilt on an accountability theory.

¶ 58 Similarly, Caraga attempts to diminish the fact that he succeeded at lowering the insurance premium at Bozic's request by explaining that he was just trying to make Bozic happy because Vista Financial wanted Bozic's business. But the trial court was entitled to reject this explanation given that only the true buyer would care about the insurance cost. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 60 (the trier of fact is not required to elevate to reasonable doubt all possible explanations consistent with innocence). The trial court was also entitled to consider (i) Caraga's instruction to Rodriguez not to date the loan application, (ii) Caraga's conduct in later filling in the incorrect date, and (iii) Caraga's *sotto voce* instructions to Rodriguez regarding the perils of submitting a change of address form to the lender. Finally, Caraga's false statements to SA Chavez attempting to cover up his involvement in the conspiracy were undeniably relevant to the trial court's accountability determination. *McCullough*, 2015 IL App (2d) 121364, ¶ 94.

¶ 59 Moreover, not only does the evidence demonstrate that Caraga furthered the common design by securing a loan for Rodriguez from PMAC, but it can be reasonably inferred that Caraga was paid for completing his part of the conspiracy. See *In re Jonathon C.B.*, 2011 IL

107750, ¶ 60 (the trier of fact may consider reasonable inferences that flow from the evidence). Bozic stated that he was going to follow Caraga out on the night that he, Caraga, and Prittis had dinner to "take care" of him. And when explaining the distribution of the proceeds from the closing to Rodriguez, Bozic explained that "15% goes to the guy at the bank who helps, like Mike, for a processing fee." Equally important was Caraga's ongoing relationship with Prittis and Bozic, despite his knowledge that in the prior real estate transactions Bozic's buyers did not live in the property, which would have given an experienced loan originator cause for concern in dealing with the same individuals going forward. See *Perez*, 189 Ill. 2d at 267; *Cowart*, 2017 IL App (1st) 113085-B, ¶ 34 (a defendant who voluntarily attached himself to a group bent on illegal acts with knowledge of the criminal design supports an inference that the group shared the common purpose).

¶ 60       Taking the evidence in record in the light most favorable to the State, a reasonable trier of fact could find that Caraga had the requisite intent to aid and abet the common scheme by completing the loan application for Rodriguez, successfully securing a mortgage from PMAC, and ensuring that the parties closed on the property. Thus, the State proved beyond a reasonable doubt that Caraga was guilty of loan fraud, financial institution fraud, and attempt theft on a theory of accountability.

¶ 61       Similarly, Caraga asserts that the State failed to prove beyond a reasonable doubt that he committed forgery or wire fraud because there was no proof that he delivered the mortgage loan application to PMAC, especially since Messina's name appeared on the application. Caraga claims that unless he was identified as the individual who uploaded the fraudulent application, he cannot be found guilty of either forgery or wire fraud.

¶ 62      An individual commits forgery when he or she intends to defraud and knowingly issues or delivers a document knowing it to have been forged or altered. 720 ILCS 5/17-3(a)(2) (West 2012). An individual commits wire fraud when he or she transmits or causes to be transmitted any writing for the purposes of obtaining money or property by false pretenses, representations, or promises. *Id.* § 17-24(b)(2).

¶ 63      We find no merit in Caraga's claims. Although the record does not establish that Caraga actually uploaded the loan application into the PMAC system, it is undisputed that he intended the completed application to be reviewed and ultimately submitted to PMAC electronically. Caraga offers no purpose for completing the application other than to submit it to PMAC for approval and eventual approval of the loan. Caraga necessarily knew the application included false information because the box specifying that the loan originator met with the buyer face-to-face was checked, but Messina, who was listed as the loan originator, never met with Rodriguez. Because Caraga did not have a loan originator's license, he could not complete the application, and it can be reasonably inferred that either he intentionally checked the box regarding Messina's in-person meeting with Rodriguez knowing that it was false or he forged Messina's signature on the application. Consequently, Caraga's convictions for forgery and wire fraud were supported by evidence beyond a reasonable doubt.

¶ 64                            C. Other Bad Acts

¶ 65      Finally, Caraga claims that the trial court abused its discretion in admitting evidence of certain other crimes: (i) that he was not a licensed mortgage broker in this transaction and (ii) that he had acted as the mortgage broker in three or four prior transactions that involved straw buyers. Caraga contends that whether he was a licensed mortgage broker was irrelevant to

determining whether he knowingly participated in the mortgage fraud and that the State used the other crimes to show his propensity to engage in fraudulent transactions.

¶ 66    The State contends that Caraga has forfeited review of this issue because he only vaguely referred to the erroneous admission of other crimes evidence in his posttrial motions. Although Caraga did not label his argument as pertaining to other-crimes evidence, construing his posttrial motions broadly, we find that Caraga sufficiently preserved the claim regarding his lack of a loan originator's license, but has forfeited review as it relates to the three or four prior transactions that also involved a straw buyer. In particular, Caraga argued in his posttrial motions that:

> "[Belinda Pinella] testified that Mr. Caraga was not licensed as a loan originator in April through July 2012. As stated during my objection to her testimony at trial, this information is irrelevant to the charges at hand. Mr. Caraga was not criminally charged with allegedly performing the duties of a loan originator when he was not licensed to do so. This allegation does not show in any way that Mr. Caraga knew the loan application was fraudulent."

Caraga's pleading and his objection at trial were sufficient to preserve his claim that evidence regarding his lack of a loan originator license should have been excluded. In contrast, Caraga only refers to the prior sham transactions in passing in his posttrial motions, *i.e.*, "Caraga alludes to co-defendant Bogdan Bozic's 'previous guys' and knowing they are not technically living there" and Prittis "did not know if Mr. Caraga had knowledge that those previous deals were shams." Because Caraga did not develop in any manner his argument that evidence relating to the prior transactions involving straw buyers should have been excluded, he has forfeited our review of that claim. Moreover, Caraga has not argued plain error on appeal, and we will not independently engage in such an analysis on his behalf as a basis to review his forfeited claim.

¶ 67        On the issue of Caraga's lack of a license, evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit a crime; such evidence may be used to show motive, intent, identity, lack of mistake, and *modus operandi*. *People v. Pikes*, 2013 IL 115171, ¶ 11. But other-crimes evidence offered for a permissible purpose will be excluded if its prejudicial impact substantially outweighs its probative value. *Id.* Admission of other-crimes evidence rests in the discretion of the trial court, and we will not disturb the trial court's ruling absent a clear abuse of discretion. *Id.* ¶ 12.

¶ 68        Caraga's failure to possess a loan originator's license was not admitted to demonstrate propensity, but was properly admitted to demonstrate his intent to commit mortgage fraud. Although Caraga was not charged with providing loan origination services without a license, he was charged with knowingly and intentionally submitting a false loan application for PMAC's approval. Caraga's provisional loan originator licensee status in 2004—about eight years before he acted as a loan originator in this case—combined with the experience he acquired by continuing to work in the mortgage industry since 2004 showed that he knew the loan origination process and how to get Rodriguez's loan application approved and funded by the bank, which was a key element to perpetuating this mortgage scheme.

¶ 69        Moreover, the trial court explained that the licensing evidence was relevant for background purposes. We must assume that the trial court in this bench trial considered the admissible evidence for its proper purpose, and not to establish propensity. *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24 (we may presume that the trial court in a bench trial only considers properly admitted evidence and considers the prior bad acts evidence for the limited purpose for which it was admitted). And admitting the evidence that Caraga was not a licensed loan originator when he completed Rodriguez's loan application was not overly prejudicial and did

not outweigh the probative value of the evidence necessary to demonstrate his knowledge and intent to submit a fraudulent loan application. Consequently, the court did not abuse its discretion by admitting into evidence Caraga's lack of a current loan origination license for purposes of demonstrating knowledge and intent.

¶ 70                                    III. CONCLUSION

¶ 71        For the foregoing reasons, we affirm Caraga's convictions for (i) loan fraud, (ii) financial institution fraud, (iii) attempted theft, (iv) wire fraud, and (v) forgery.

¶ 72        Affirmed.