**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 230124-U

Order filed June 6, 2025
_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-23-0124 Circuit No. 18-CF-2642 |
| | ) | |
| EMILIO S. GUILLEN, | ) ) | Honorable Michael W. Reidy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ANDERSON delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.
_____

**ORDER**

¶ 1      *Held*:    (1) The court did not improperly admit hearsay statements; (2) Defendant was not prejudiced by other crimes evidence.

¶ 2      Defendant, Emilio S. Guillen, appeals from his conviction for first degree murder, arguing (1) the Du Page County circuit court erred in admitting hearsay statements and (2) he was denied a fair trial where the jury heard prejudicial other-crimes evidence. We affirm.

¶ 3                    I. BACKGROUND

¶ 4 Defendant was charged, *inter alia*, with six counts of first degree murder (720 ILCS 5/9-1(a)(1), (2), (3) (West 2018)). The charges alleged defendant, along with Juan Calderon and Fredi Bautista, shot and killed Alexander Nicolas on November 8, 2018.

¶ 5 The State also filed a pretrial motion *in limine* to admit several statements made by coconspirators, including: Calderon stating, "[I] think[ ] [I] got him"; Bautista stating, "We do this. This ain't nothing new"; either Calderon or Bautista identifying Nicolas as a rival gang member; and statements discussing that Calderon should shower and burn his clothes. The court granted the State's motion, finding that there was circumstantial evidence of a conspiracy because defendant and the coconspirators were in the vehicle together, exited the vehicle together, returned to the vehicle together following the murder before absconding together, and then destroyed evidence with the same common plan or design.

¶ 6 A joint trial was held for defendant and codefendant Calderon before two six-person juries. Detective Daniel Herbert of the West Chicago Police Department was certified as an expert in gang crimes. Herbert testified that two gangs, the Latin Counts and the Satan Disciples, had been engaged in a longtime rivalry. He identified La Raza and Two Six as other gangs in the area. On November 9, 2018, Herbert responded to the discovery of a body. He identified the body as Nicolas. Herbert obtained video from surveillance cameras at a residence. The footage showed a vehicle parked on the side of the road at approximately 11:15 p.m. on November 8, 2018. Four men exited the vehicle before approaching another man on the sidewalk. The five men stood around for approximately two minutes before they engaged in a brief physical altercation. Three of the men from the vehicle surrounded the victim while the fourth individual from the vehicle stood several feet away. The four men then ran back to the vehicle and drove away. The footage was admitted without objection.

¶ 7        Herbert identified Jesus Favela from the footage as one of the men exiting the vehicle. Herbert had prior interactions with Favela and knew he was affiliated with La Raza. During Favela's interview, he identified the three other men as defendant, Calderon, and Bautista. Herbert verified all three men were members of the Satan Disciples and made in-court identifications of Calderon and defendant.

¶ 8        During the course of his investigation, Herbert learned the group fled to an apartment complex in Aurora. Surveillance footage from the apartment complex was stipulated to and admitted into evidence. The footage showed four men enter an apartment shortly after midnight on November 9, 2018. Approximately 45 minutes later, two men exited a side door with one holding a filled trash bag. The two men returned 10 minutes later without the trash bag. The following morning, the four men exited the apartment together shortly after 8 a.m. Herbert interviewed Bautista on October 2, 2018. Herbert identified an exhibit as a DVD containing Herbert's interview of Bautista. The exhibit was admitted into evidence but not published to the jury.

¶ 9        Favela testified he was a member of La Raza. The night of the murder, he went to a bar at approximately 4 p.m. where he saw defendant, Bautista, and Calderon outside. Favela had known Bautista for 10 years and had met defendant several times. Favela had never met Calderon. Favela knew defendant and Bautista were members of the Satan Disciples and believed defendant was a high ranking member. Favela observed a hierarchy among the three Satan Disciples present that night with defendant at the top, "call[ing] the shots." The four men began consuming alcohol. Defendant told Favela he had a firearm outside ready to shoot oppositional gang members.

¶ 10       Later, at approximately 11 p.m., Favela asked for a ride to a party. While driving there, Bautista said, "there goes that two-six." Bautista was referring to Nicolas, who was affiliated with

3

the rival Two Six gang. Defendant exited the vehicle and approached Nicolas. The other three men followed. Defendant and Nicolas exchanged insults before defendant and Bautista physically attacked Nicolas. Favela tried to stop the fight, saying "[s]top. Stop. Let him go[,]" and insisted that Nicolas was not an "active gangbanger." Defendant instructed Calderon to "[m]uke him[,]" which Favela interpreted to mean "[s]hoot him." Calderon then approached Nicolas and put a gun to the back of his head and shot him. The three Satan Disciples ran to the vehicle and initially began driving away without Favela. Favela froze "in shock." The vehicle stopped after driving for approximately 20 feet. Then, Favela entered the vehicle, and the group drove away.

¶ 11　　　While in the vehicle, Calderon stated, "[I] think[ ] [I] got him." Calderon informed the group that he believed his baseball hat fell off during the confrontation and was left behind. Favela started panicking. Calderon was sitting directly behind Favela. Favela believed Calderon was going to shoot him. Bautista told Favela to relax, stating, "We do this. This ain't nothing new." Bautista gave Favela a Xanax.

¶ 12　　　They drove to an apartment Favela was unfamiliar with. Defendant, Calderon, and a man named "Kenny" were in one room. Favela was asked to sit in another room because he was not a member of the Satan Disciples. Favela overheard someone say, "Take a shower, burn the clothes." Calderon changed his clothes, showered, and burned the clothes he was wearing during the murder. When Favela returned home the following morning, he packed clothes and went to his grandmother's house. Favela was considering fleeing. He was "[n]ervous[,] [s]cared[,]" and "[d]idn't know what to do." After speaking to his lawyer, Favela turned himself in. Favela did not run away from the group or use his phone to call 911 on the night of the murder because he was afraid he would also be shot. Favela, instead, was "playing the role" for fear of his life.

4

¶ 13    Bautista testified on behalf of the State in exchange for a guilty plea to aggravated battery with a firearm and a sentence of 15 years' imprisonment. The State asked why Bautista was wearing a red jumpsuit instead of the usual orange jumpsuit. Bautista stated the administration had him under "basically protective custody." Bautista testified it was essentially solitary confinement and was done for his safety. The State elicited testimony from Bautista that, as a result of being placed in solitary confinement, Bautista had no contact with Favela, Calderon, or defendant since being taken into custody.

¶ 14    Bautista had known defendant and Calderon since 2012. Bautista testified it was Favela who initially pointed out Nicolas while they were driving. Defendant then pulled the vehicle over "real quick, recklessly." Defendant punched Nicolas, and they began fighting. Nicolas began to overpower defendant. Bautista saw Calderon holding a gun. Defendant said "something along the lines of, Get him[,]" before Calderon shot Nicolas. Bautista had taken two Xanax earlier in the night which caused "[a] lot of blacking in, blacking out ***."

¶ 15    The State introduced several witnesses to establish that (1) a burn pile was found near the apartment identified by Favela, (2) a hat at the scene of the murder contained Calderon's DNA, and (3) defendant was apprehended attempting to sell his vehicle two days after the murder. The medical examiner also testified Nicolas died of a single gunshot wound to the head.

¶ 16    A DVD exhibit of Bautista's interview with the prosecutor and investigating officer was introduced into evidence but not published to the jury. It was not included in the list of exhibits to be submitted to the jury. However, during jury deliberations, the jury asked for the time stamp where Bautista told the police that defendant said, "Get him." The exhibit had been inadvertently submitted to the jury and was subsequently retrieved. The court instructed the jury that the exhibit "was never published to the jury and the actual video is not to be considered by you. However you

5

can consider any live, in-court testimony related to" the exhibit. Counsel did not object to the instruction. During the interview, Bautista stated defendant was out of control on the night of the shooting. Bautista further stated that defendant had a "Napoleon complex," and "fanc[ied]" himself as a high up in the Satan Disciples.

¶ 17    The jury found defendant guilty of first degree murder under an accountability theory and also found that he was armed with a firearm during the offense. Defendant filed a motion for a new trial, in part arguing the court erred in admitting the coconspirator statements. The court denied the motion. The court sentenced defendant to 50 years' imprisonment. Defendant appealed.

¶ 18                                   II. ANALYSIS

¶ 19    On appeal, defendant argues (1) the court erred in admitting hearsay statements made by coconspirators and (2) he was denied a fair trial where the jury heard prejudicial other-crimes evidence. We will consider each argument in turn.

¶ 20                          A. Statements by Coconspirators

¶ 21    Defendant argues four hearsay statements were improperly admitted: Calderon's statement, "[I] think[ ] [I] got him"; Bautista's statement, "We do this. This ain't nothing new"; either Bautista or Favela's statement initially identifying Nicolas; and statements from defendant, Calderon, and "Kenny," discussing that Calderon should shower and burn his clothes. Defendant first argues the statements were improperly admitted as statements by coconspirators because there was insufficient independent evidence of a conspiracy. The admission of coconspirator statements is reviewed for an abuse of discretion. *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 64. An abuse of discretion occurs where the "decision is arbitrary, fanciful, or unreasonable such that no reasonable person would agree with it." *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 36.

6

¶ 22    "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). One such exception is the coconspirator exception, which permits admission of any act or declaration made by a coconspirator during the pendency of and in furtherance of the conspiracy. *People v. Kliner*, 185 Ill. 2d 81, 141 (1998). Statements are made in furtherance of a conspiracy where the statements have the effect of "advising, encouraging, aiding or abetting its perpetration." *Id.*

¶ 23    The State must make a *prima facie* evidentiary showing of the existence of a conspiracy between the declarant and defendant. *Caraga*, 2018 IL App (1st) 170123, ¶ 39. The conspiracy may be established from circumstantial evidence. *Id.* The court may draw broad inferences from the evidence "because of the necessarily clandestine nature of conspiracies." *Id.* To make a *prima facie* showing of a conspiracy,

> "the State must prove by a preponderance of the evidence (independent of the coconspirator's hearsay statements) that: (1) two or more persons intended to commit a crime; (2) they engaged in a common plan to accomplish the criminal goal; and (3) an act or acts were done by one or more of them in furtherance of the conspiracy." *People v. Leak*, 398 Ill. App. 3d 798, 825 (2010).

¶ 24    Here, defendant, Calderon, and Bautista were members of the same gang. Nicolas was a member of a rival gang. The three gang members spent all day at a bar before leaving together. After Nicolas was identified as a member of the rival gang, defendant pulled the vehicle over. As a group, the four men exited the vehicle and confronted Nicolas. Defendant instructed Calderon to "Get him[,]" shortly before Calderon shot Nicolas. Following the murder, they all fled the scene and did not separate until the next day. Calderon burned his clothes and showered in an attempt to

7

destroy evidence. For the same purpose, defendant attempted to sell his vehicle. The circuit court determined the State made a *prima facie* evidentiary showing that the group intended to murder Nicolas, engaged in a common plan to that end, and acted in furtherance of the conspiracy, both before and after the murder. We do not believe this determination was an abuse of discretion, particularly given the coconspirators' prior association, the fact that the entire group confronted Nicolas, defendant's instruction to shoot Nicolas, the attempts after the murder to conceal the coconspirators' involvement, and the broad inferences this evidence permitted.

¶ 25    Defendant further argues that even if the State made a *prima facie* showing of a conspiracy, the statements, "[I] think[ ] [I] got him" and "We do this. This ain't nothing new[,]" were improperly admitted because they were not made in furtherance of a conspiracy. We initially note that "[h]earsay *** is not involved where the statement is offered, not for its truth, but for some other reason, like the effect on the listener." *People v. Saulsberry*, 2021 IL App (2d) 181027, ¶ 80. Bautista's statement, "We do this. This ain't nothing new[,]" was not offered to prove the truth of the matter asserted but instead was offered for the purpose of explaining Favela's failure to report the murder or separate from the group at an earlier time. Whether Bautista's statement was true or not, it was relevant for its effect on Favela and helped to explain his continued acquiescence to the concealment and association with the group.

¶ 26    Regardless, both statements were properly admitted as statements made in furtherance of a conspiracy. Statements made after the subject offense may be admissible if they are made sufficiently proximate in time to the offense and in furtherance of an effort at concealment. *Kliner*, 185 Ill. 2d at 141-42. Statements merely narrating or bragging about past events do not fall under the hearsay exception because they are not made in furtherance of the conspiracy or in furtherance of an effort at concealment. *People v. Wilson*, 302 Ill. App. 3d 499, 511 (1998) ("[The

8

coconspirator's] statements that he committed the crime, that they probably did not think he was going to go through with it, that it was the easiest $200 (or $1,000) he had ever made, and that [the witness] was a coward for not helping can hardly be characterized as an attempt at concealment.").

¶ 27        Here, as the group was fleeing the scene of the murder in the vehicle, Calderon stated, "[I] think[ ] [I] got him" and believed he left his hat at the scene of the murder. These statements were not mere narration of past events but instead conveyed critical information to the group so they could determine their next steps in concealing their guilt. Bautista's statement, "We do this. This ain't nothing new[,]" was intended to calm Favela down and obtain his acquiescence in proceeding with fleeing the scene and concealing their participation in the murder. Favela was the clear weak link to any concealment efforts. He was not a member of the Satan Disciples, did not initially run to the vehicle with the rest of the group, and was visibly shaken and panicking following the murder. Bautista reasonably believed he needed to downplay the murder to ensure Favela's cooperation. Both statements were therefore made in furtherance of the conspiracy and were properly admitted.

¶ 28        Defendant alternatively argues Bautista's statement, "We do this. This ain't nothing new[,]" was improper other-crimes evidence. Evidence of other acts is generally inadmissible to show defendant's propensity to commit the charged offense. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). However, "the concerns underlying the admission of other-crimes evidence are not present when the uncharged crime or bad act was not committed by the defendant." *People v. Pikes*, 2013 IL 115171, ¶ 16. Reviewing the statement in context, there is no reason to believe Bautista was admitting to committing other murders. Instead, Bautista was attempting to calm Favela down by reassuring him. Moreover, it is unclear what Bautista was referring to when making the statement.

9

¶ 29 Defendant next argues the admission of Calderon's statement, "[I] think[ ] [I] got him," violated defendant's right to confront Calderon at the joint trial. A criminal defendant has the right to be confronted with the witnesses against him under the sixth amendment. U.S. Const., amend. VI. The confrontation clause prevents testimonial hearsay statements from being admitted unless the declarant is unavailable and the defendant has previously had a chance to cross-examine the declarant. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). Only testimonial statements are subject to the confrontation clause. *Id.* Coconspirator statements are not testimonial in nature. *Id.* at 56. Here, defendant's right to confrontation was not violated because the statement was properly admitted as a statement made by a coconspirator.

¶ 30 B. Other-Crimes Evidence

¶ 31 In addition to the statements above, defendant argues that the jury heard additional prejudicial other-crimes evidence when Bautista indicated that he was in solitary confinement for his protection and it inadvertently received Bautista's statements to the police where he described defendant as out of control on the night of the murder, indicated that defendant had a "Napolean complex," and stated defendant wanted to prove himself in the Satan Disciples. This issue was not preserved. Defendant, instead, urges us to review the matter under both prongs of the plain error analysis. "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). The first step in applying the plain error doctrine is determining whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 32 1. Bautista's Solitary Confinement

10

¶ 33        "Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence in the case more probable or less probable than it would be without the evidence." *People v. Bedoya*, 325 Ill. App. 3d 926, 937 (2001). Here, Bautista's contact with the other witnesses, codefendants, or any Satan Disciples was relevant as to his credibility. The degree of consistency between Bautista and Favela's testimony was highly relevant to this matter, and the State permissibly established they did not coordinate their testimony. The State did not linger on the issue, and defendant was not explicitly mentioned. Further, Bautista was a member of a gang involved in the murder of a rival gang member and was testifying against his fellow gang members. Accordingly, even though one inference from the testimony is that Bautista feared retaliation by defendant, an equally valid inference is Bautista needed protection against a rival gang or a different member of his own gang. The admission of the testimony was, therefore, not clear or obvious error. Defendant's alternative argument, that counsel was ineffective for failing to object to the testimony, fails for the same reason. See *People v. Jones*, 2020 IL App (4th) 190909, ¶ 179 ("Absent a clear or obvious error ***, neither the doctrine of plain error nor a theory of ineffective assistance affords any relief from the forfeiture.").

¶ 34                                    2. Bautista's Interview

¶ 35        Generally, the decision of what items of evidence should be taken to the jury room is left to the circuit court's sound discretion. *People v. Cloutier*, 178 Ill. 2d 141, 173 (1997). Here, the court properly exercised its discretion in determining the exhibit should not be submitted to the jury. However, the exhibit was inadvertently submitted to the jury. On appeal, we accept defendant's argument that the inadvertent disclosure constituted clear or obvious error because the recorded interview was never published to the jury during trial and should not have been submitted

11

to the jury room. We therefore next determine whether the inadvertent disclosure warrants reversal under either prong of the plain error analysis.

¶ 36    When determining whether the evidence is closely balanced under the first prong, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. Under the common design rule, where the defendant and others engage in a common criminal design, the defendant is responsible for any criminal acts done in furtherance of the common design. *People v. Fernandez*, 2014 IL 115527, ¶ 13. "[T]he State need only prove the accused had the specific intent to promote or facilitate *a* crime. Once the State proves the accused intended to promote or facilitate *a* crime, it has established the accused's responsibility for *any* criminal act done in furtherance of the intended crime." (Emphases in original.) *People v. Houston*, 258 Ill. App. 3d 364, 369 (1994). Whether the defendant (1) was present during the offense, (2) fled from the scene, (3) maintained a close affiliation with others involved after, or (4) failed to report the crime are all factors normally considered in determining accountability. *People v. Perez*, 189 Ill. 2d 254, 267 (2000).

¶ 37    Here, the evidence was not closely balanced as to defendant's guilt. Defendant was the highest ranking Satan Disciple present the night of the murder. Defendant told Favela earlier in the night he had a firearm outside ready to shoot oppositional gang members. Both Favela and Bautista testified defendant ordered Calderon to shoot Nicolas. Even assuming Favela and Bautista's testimony and video evidence was insufficient to overwhelmingly establish defendant ordered Calderon to shoot Nicolas, all four factors strongly support defendant's accountability. Not only was defendant present during the murder, he also instigated the incident by pulling the vehicle over and then confronting Nicolas. After the murder, he fled the scene with the others. The

12

group spent the night together at an apartment. As a group, they destroyed evidence and attempted to conceal their involvement in the matter. Defendant personally attempted to sell the vehicle the group was driving the night of the murder. Defendant failed to report the incident. Given the overwhelming evidence establishing defendant's accountability for the murder, we decline to review the error pursuant to the first prong of the plain-error analysis.

¶ 38    The second prong of the plain error analysis has been equated with structural error. *People v. Jackson*, 2022 IL 127256, ¶ 28. Structural errors are those which "erode the integrity of the judicial process and undermine the fairness of the defendant's trial." *Herron*, 215 Ill. 2d at 186. "An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence." *People v. Thompson*, 238 Ill. 2d 598, 609 (2010). Generally, constitutional violations that result in the admission of erroneous evidence are not considered structural errors. *In re Brandon P*., 2014 IL 116653, ¶¶ 48-50. Here, the erroneous admission of the exhibit did not render the trial fundamentally unfair. Most of the information contained in the interview was cumulative of evidence properly introduced at trial, including the evidence that defendant viewed himself as a higher up in the Satan Disciples. The other isolated comments, even if improper, were not so prejudicial that the error could not be cured with a jury instruction. *People v. Moody*, 2016 IL App (1st) 130071, ¶ 60. The court instructed the jury not to consider Bautista's interview, and we presume the jury followed this instruction. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995).

¶ 39    Defendant alternatively argues counsel was ineffective for failing to investigate the jurors' exposure to the recorded interview and moving for a mistrial. Illinois courts review claims of ineffective assistance of counsel under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Wise*, 2019 IL App (2d) 160611, ¶ 51. Under *Strickland*, counsel renders

13

ineffective assistance when (1) counsel's performance falls below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's deficient performance, the results of the proceedings would have had a different outcome. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24. "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377 (2000).

¶ 40        For the same reasons we decline to apply the plain error doctrine, defendant cannot show he was prejudiced by counsel's failure to investigate the exposure of the jury to the interview or move for a mistrial. *People v. White*, 2011 IL 109689, ¶ 133 ("Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced ***."). The evidence of defendant's guilt was overwhelming, and any prejudice resulting from the evidence was cured by the court's jury instruction. Because defendant cannot establish he was prejudiced by counsel's performance, he cannot establish ineffective assistance of counsel. See *Enis*, 194 Ill. 2d at 377.

¶ 41                                III. CONCLUSION

¶ 42        The judgment of the circuit court of Du Page County is affirmed.

¶ 43        Affirmed.