NOTICE

Decision filed 05/15/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 230251-U

NOS. 5-23-0251, 5-23-0252 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Montgomery County. |
| | ) | |
| v. | ) | Nos. 14-CF-110, 14-CF-122 |
| | ) | |
| LLOYD RAY PERKINS, | ) | Honorable |
| | ) | James L. Roberts, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CLARKE* delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Where (1) the evidence at trial was sufficient to support defendant's conviction; (2) the defendant failed to preserve evidentiary objections at trial, and failed to prove plain error; (3) the trial court did not abuse its discretion when it allowed statements of a co-conspirator into evidence; (4) defendant stipulated to certain evidentiary admissions; (5) the court did not abuse its discretion when it allowed the impeachment by prior inconsistent statement of a witness during redirect examination; and (6) defendant's *Krankel* counsel on remand was not ineffective, we affirm the judgment of the circuit court.

¶ 2    Defendant Lloyd Ray Perkins was charged with armed robbery, unlawful use of a weapon by a felon, and aggravated discharge of a firearm in Montgomery County circuit court case No. 2014-CF-110. Defendant was also charged with obstruction of justice in Montgomery County

_____

        *Justice Moore was originally assigned to the panel before his retirement. Justice Clarke was substituted on the panel and has listened to oral arguments and read the briefs.

1

circuit court case No. 2014-CF-122. Defendant was convicted in the obstruction case on April 8, 2015, and filed his notice of appeal in the Illinois Appellate Court, Fifth District, case No. 5-15-0393 on September 3, 2015. Defendant was convicted in his other case of armed robbery and unlawful use of a weapon by a felon on March 17, 2016, and he filed his notice of appeal in Illinois Appellate Court, Fifth District, case No. 5-16-0182 on April 27, 2016.

¶ 3    On November 26, 2018, this court entered judgments in both cases, remanding the obstruction of justice case for *Krankel* proceedings, and the armed robbery case for reconsideration of the trial court's denial of trial counsel's motion to withdraw, based on the court's findings in the *Krankel* proceedings. On March 23, 2023, the trial court entered an order regarding the matters on appellate remand, denying the defendant his requested relief in both cases.

¶ 4    On April 13, 2023, defendant filed his notice of appeal for the orders entered on remand in both cases, and on April 24, 2023, defendant filed amended notices of appeal. The appeal from the armed robbery case was assigned as Illinois Appellate Court, Fifth District, case No. 5-23-0251. The appeal from the obstruction of justice case was assigned as Illinois Appellate Court, Fifth District, case No. 5-23-0252. On March 21, 2024, the defendant filed a motion to consolidate both appeals into one case. The motion to consolidate was granted by this court on March 25, 2024, and both cases were consolidated into Illinois Appellate Court, Fifth District, case No. 5-23-0251.

¶ 5                                    I. BACKGROUND

¶ 6    We begin by noting that due to the length of the record in this case, we are limiting our recitation of facts in the background section to those relevant to a general understanding of the disposition of this appeal. Additional specific facts will be presented in the analysis of each claim as necessary.

¶ 7    On July 14, 2014, the defendant, Lloyd Ray Perkins, was charged, by information, with three counts of armed robbery and one count of unlawful use of a weapon by a felon in Montgomery County circuit court case 2014-CF-110. 720 ILCS 5/18-2(a)(2), 24-1.1(a) (West 2012). On August 6, 2014, the charges by information in this case were superseded by grand jury indictments, which added a count of aggravated discharge of a firearm in addition to the previously pending four counts. *Id.* § 24-1.2(a)(2).

¶ 8    Also, on August 6, 2014, the defendant was charged, by indictment, with the offense of obstructing justice in a separate Montgomery County circuit court case, 2014-CF-122. See *id.* § 31-4(a)(1). The indictment alleged that the defendant, "with the intent to obstruct his prosecution, knowingly concealed physical evidence, in that [he] requested that Meghan Finley find and destroy a shotgun that was ultimately placed into a pond by Finley" at an address in Montgomery County. Additionally, on January 14, 2015, a second count of obstructing justice was charged, by information, against the defendant in the obstructing case. The information was similar to the previous indictment on the same charge, although the information alleged in detail that on the date in question, the defendant "with the intent to obstruct the prosecution of [the defendant] for the offense of Armed Robbery, knowingly concealed physical evidence, in that [the defendant] directed Meghan Finley to the location of a shotgun that she then placed into a pond located at" an address in Montgomery County. The State also requested that the previous indictment for obstructing justice be dismissed.

¶ 9    On April 7, 2015, the obstructing justice case proceeded to a jury trial. Following preliminary discussions among the parties and the court, a jury was selected and sworn in, and opening statements were held. Thereafter, the State began its case by calling Captain Craig Foster, who testified that he had served as the jail administrator for the past nine years. He testified as to

3

how the jail's inmate phone system was set up, with each of the 11 "dayrooms" having its own phone for inmate use via a phone account. He testified that each dayroom is located in front of a set of cells and serves as the common area for inmates during the day. Additionally, he testified that inmates are unable to move from one dayroom to another dayroom. Captain Foster also testified that each inmate has an account set up with the phone system, including a PIN number and security code. He further testified that all calls are recorded. Captain Foster explained that, to place an outgoing call, all that is needed is the PIN and security code. When an inmate places a call, it begins with a prerecorded message featuring the inmate stating their name. Captain Foster additionally testified that only one cell was located on North Day 4, and that the inmate assigned to that cell on July 24, 2014, was the defendant. Captain Foster further testified that he reviewed the log of calls out of North Day 4 on July 24, 2014, and four calls were retrieved from the system. He testified that the recordings of the calls were placed onto a disk, and that disk was the same one entered into evidence as People's Exhibit 1. He further testified that the phone calls were placed under another inmate's phone account, but that he recognized the voices on the phone call as those of the defendant and Finley. Captain Foster was then cross-examined by defense counsel as to the recording system and his ability to recognize the voices he heard in the phone call. Following additional testimony on redirect, the four recordings from Exhibit 1 were played for the jury.

¶ 10     The State next called Finley to testify. Outside the presence of the jury, the court questioned Finley about her willingness to testify, and Finley indicated she would be an unwilling witness. The court then warned Finley that, because she had already pled guilty to obstructing justice in her case, she could not refuse to testify under the fifth amendment, as the State had agreed that she would not be subject to any additional penalties in regard to charges of obstructing justice related to her actions in this case. She was also warned that refusing to testify could result in her being

4

found in contempt of court and jailed until she provided her testimony. The jury was then brought back into the courtroom, and Finley was sworn in. The State then began to examine Finley; however, after answering some introductory questions, Finley refused to testify any further. The jury was then excused from the courtroom, and the court questioned Finley as to whether she would provide further testimony. She indicated she would not, and the court found her in contempt and informed her that she may purge her contempt by providing her testimony. The jury was then brought back into the courtroom and excused for the day. After the jury left the courtroom, the court was informed that Finley had changed her mind and would agree to testify. After some discussion on how to proceed, the court decided to retrieve the jury, and the case proceeded with Finley's testimony that day.

¶ 11    During her continued direct testimony, Finley testified that she did not remember how she found the shotgun. She testified that she and the defendant had never discussed a gun, though she did admit that they had called each other while he was in custody. She also testified that she and the defendant were in a relationship at the time of the jail call, and that she was not in a relationship with Cochran (the inmate whose account was used to place the outgoing calls in North Day 4 on July 24, 2014). She further testified that no one directed her to dispose of the shotgun, but instead, since she thought it might "have something to do with a criminal case involving a few people" that she knew, including the defendant, and she decided she "wanted it gone." Additionally, she testified that she was with George Pollard when he threw the shotgun in the pond for her, and that she wanted him to throw it in the pond to get rid of it. Finley also testified that the shotgun that had been marked as People's Exhibit 4 was the same size as the shotgun she and Pollard had attempted to dispose of in the pond, but stated that all guns looked the same to her. Finally, she testified that she still cared for the defendant and did not wish to testify.

5

¶ 12    On cross-examination, Finley testified that she had suffered a head injury in 2011 that affected her memory and that she had also been addicted to drugs and pills prior to her arrest, which affected her ability to remember things. Finley further testified that when she gave a statement to police at the time she was arrested on July 29, 2014, she had just received morphine and "taken 10 to 12 Vicodin." She also testified as to her other criminal convictions and stated that the State was threatening additional criminal charges if she refused to testify. Finally, Finley testified that Pollard had previously dealt and done drugs with her, and that she believed he was a liar.

¶ 13    On redirect examination, Finley testified that she did not consider Pollard to be a friend even though they had used drugs together. The State then attempted to impeach Finley by examining her regarding the content of the July 29, 2014, statement she gave to police after she was arrested, during which she allegedly told police that the defendant had directed her to where the gun was located. Defense counsel objected on the grounds that the statement's content was outside the scope of direct. The court then heard arguments on the objection outside the presence of the jury, after which the court ruled that the defendant had opened the door on cross-examination. The State then withdrew the earlier question and attempted to rephrase it. Over the defendant's continuing objection, Finley admitted she may have told the police how she found the shotgun, but stated she did not remember what she told them. Following redirect testimony, the court adjourned the trial for the day.

¶ 14    The jury trial resumed the following day, April 8, 2015. Outside the presence of the jury, the State asked the court to consider its motion *in limine* regarding the introduction of co-conspirator hearsay related to Finley's statements to Pollard about the defendant's instructions for the shotgun. Arguments on the matter were heard by the court, and the court concluded that, subject

to Deputy Sanford's testimony and the State connecting the dots on its proffer, the court would permit the hearsay statements subject to a continuing objection. The jury was then brought in and seated.

¶ 15    The State then called its next witness, Pollard, who testified that in July of 2014, he resided in a mobile home in Litchfield that sat on the same property as Finley's mobile home, and that the property both homes sat on was nicknamed "the chicken ranch." Pollard further testified that Finley told him she wanted to get rid of some stuff and asked if he had a sack. He testified that he gave her a clear drawstring sack, the type used by hospitals for personal items, and that she placed a sawed-off shotgun and some shoes into it. Pollard also testified that Finley asked him where she could get rid of the items, so he told her that she could put them in the pond on the back of the property. Pollard then testified that Finley requested that he help her dispose of the items in the pond, because she did not think she could throw the items very far. He testified that he then helped her by throwing the items into the pond while she accompanied him. He testified that while they were disposing of the items, he asked her how she found the gun, and over a defense objection, he testified that she said that the defendant had directed her to the shotgun and asked her to get rid of it. Additionally, Pollard testified that over the next few days after disposing of the shotgun he was interviewed by the police, including by Deputy Sanford. He testified that he was present when the police then came to the property with a dive team and recovered the gun and shoes that he and Finley had thrown in the pond. Pollard also testified that he recognized the gun from an armed robbery that had occurred a couple of weeks earlier, which he witnessed from around 75 feet away.

¶ 16    On cross-examination, Pollard testified that he did not remember the exact date the robbery occurred, only that it was a Saturday evening. He testified that he was inside for part of the robbery but could see it through the side windows of his mobile home as the front windows were boarded

7

up, and that he was also outside for part of it. Pollard additionally testified that the individual who had the shotgun during the armed robbery was not the defendant, but was another man named Buffington. Defense counsel then questioned Pollard as to his testimony that the breach-loading shotgun recovered from the pond was the same one used in the armed robbery. Counsel brought to Pollard's attention prior statements that the shotgun used in the armed robbery was a pump-style shotgun, as opposed to breach-loading. Pollard testified that he was not familiar with guns and so did not know one type of gun from another. He also testified that he did not know that Buffington owned a pump shotgun that was recovered by the police at Buffington's house, but he acknowledged that he thought Buffington took the shotgun with him after the armed robbery. Pollard also testified on cross-examination that he had not been charged in connection with his role in the disposal of the shotgun, and that he had a pending drug charge for selling Vicodin that had been reduced from a Class 2 felony to a Class 4 felony "before any of this happened". He also testified that he had initially lied to the police about having an alibi for the armed robbery, claiming that he was somewhere other than his mobile home at the chicken ranch when it happened, and acknowledged that he was not charged with obstruction of justice for lying to a police officer as a result of doing so. Finally, he testified that he no longer dealt drugs in response to a question about a text he had received.

¶ 17    On redirect examination, Pollard testified that he had received an offer of first offender probation in May of 2014 but that he had not taken the offer yet because he had not heard from his attorney. He also testified that he did not know when he informed the officers he had lied about his alibi, but agreed it was shortly after he made the statement to police.

¶ 18    Following Pollard's testimony, the court took a short recess, then resumed with the State calling Chief Deputy Bruce Sanford to testify. Deputy Sanford testified that he had reviewed the

8

four previously admitted jail calls on April 25, 2014, and that, based on previous conversations with the defendant, he recognized the voice on the call to be the defendant's. He also testified that the first time he heard the female voice on the phone calls, he was unsure who it was, but that based on subsequent conversations with the individual, he now recognizes it as belonging to Finley. Deputy Sanford further testified that the following day, April 26, 2014, he interviewed Pollard at Pollard's residence about any involvement he may have had in hiding evidence. Deputy Sanford testified that the next day he asked Pollard to come to the station for a full interview regarding the hiding or destruction of evidence, and that following the interview, a search warrant for "the chicken ranch" property was obtained. Deputy Sanford also testified that he was present when the search warrant was executed, along with other officers, members of the Litchfield Fire Department Dive Team, Pollard, and Finley. Deputy Sanford further testified that the divers recovered both the shotgun and the shoes that were thrown in the lake, but the condition of the items had changed from when they were recovered because they had been dried out. Deputy Sanford testified that they were transported wet to the crime lab to maintain the conditions they were recovered in, but that he recognized the items presented to the jury to be the same items that were recovered. Additionally, Deputy Sanford testified that the shotgun recovered matched the description of a shotgun used in an armed robbery, described as a breach-style type sawed-off shotgun, over a defense objection. Finally, Deputy Sanford testified that several shotgun shells matching the recovered shotgun's gauge were found at the chicken ranch property.

¶ 19    On cross-examination, Deputy Sanford testified that there were no serial numbers on the firearm that could confirm it was the same gun. Deputy Sanford explained no tests for fingerprints or gunshot residue were conducted on the shotgun as the crime lab had stated it could not be done; moreover, he was unsure if the shotgun shells recovered from the property were ever tested for

9

fingerprints. Additionally, Deputy Sanford testified that he was aware that Buffington was the party believed to have had the shotgun during the armed robbery, and that no witness to the armed robbery said that the defendant had a shotgun. Deputy Sanford testified that he was unaware that at least one witness described the shotgun as a pump-style shotgun, but he was aware that a pump-style shotgun was recovered from Buffington's house after the armed robbery. Deputy Sanford further admitted that people sometimes sound different over the phone than in person, that he was not trained in voice recognition, and that he had initially relied on Captain Foster's recognition of Finley's voice since he did not recognize it when he first heard it. Deputy Sanford also admitted that he had only spoken to the defendant a half-dozen times before he heard the jail phone call and recognized his voice.

¶ 20    On redirect examination, Deputy Sanford testified that he had heard the allegation that it was a pump shotgun used in the armed robbery for the first time shortly before the trial from defense counsel. Deputy Sanford also testified that, while he did not recognize Finley's voice when he first heard it, he has since had conversations with Finley and now recognizes her voice to be the same one from the recordings. On recross, Deputy Sanford stated that he was not familiar with another witness statement from the armed robbery that the shotgun used was a double-barreled shotgun.

¶ 21    Following Deputy Sanford's testimony, the State next called Deputy Sheriff Rick Furlong to testify. The State opened with some preliminary questions, then inquired about the condition of the defendant's residence when the deputy arrived at the home on July 13, 2014. Defense counsel objected, and, in a sidebar outside the presence of the jury, indicated that he believed the State was improperly attempting to enter other crimes or bad acts into evidence. The State argued that it was proper to admit the evidence for the purpose of establishing the identity of the parties in the

recorded jail phone calls because of the reference to an item "burning" in in the calls, and both the defendant and Finley would know about the house fire.

¶ 22    The court, prior to making a ruling on the introduction of the evidence, indicated that it believed the fact that Deputy Furlong arrived to serve a warrant would be unduly prejudicial to the defendant. However, the court also indicated that it was inclined to allow the fact that the house was on fire when the deputy arrived into evidence. Defense counsel then suggested the parties stipulate to the fact that the house was on fire when Deputy Furlong arrived, and that both the defendant and Finley were present at that time. The State agreed to the stipulation. Following the stipulation, Deputy Furlong was permitted to step down.

¶ 23    The State then rested, and the defendant made a motion for a directed verdict of acquittal. The court delayed its ruling for the sake of witness convenience and allowed the defendant to call his two witnesses. The first was Officer James Wolf, of the Illinois State Police, who testified that during his investigation of the armed robbery, he had interviewed Pollard, and that Pollard had said "yes" when asked if the shotgun was a pump action. Officer Wolf also testified that Pollard said he did not have expert knowledge of weapons but that he did identify the shotgun as sawed off.

¶ 24    Following Officer Wolf's testimony, the defendant called Rhonda Keech, who was a private investigator hired by defense counsel. Keech testified that she interviewed Pollard, who told her that the shotgun used in the armed robbery was "a sawed-off single barrel shotgun" and that Pollard had indicated it was a pump action.

¶ 25    The defense then rested its case, and outside the presence of the jury, the court went through the exhibits and reviewed which ones were or were not admitted. Next, the court denied the defendant's motion for a directed verdict, finding that the State had proved a *prima facie* case of

11

obstruction of justice. The court then went through jury instructions with the parties, as well as what evidence would or would not be sent back with the jury. At the conclusion of those discussions, the jury was brought back in, and the remaining stipulation as to the armed robbery charge was read to the jury. The parties then presented their closing arguments to the jury, and the jury instructions were given by the court. The case was then sent to the jury for deliberations. After deliberation, the jury returned a verdict of guilty on the charge of obstructing justice, and the court set the case for a sentencing hearing.

¶ 26    On April 15, 2015, defense counsel filed a motion to withdraw from the armed robbery case that had not yet gone to trial. Defense counsel did not move to withdraw from the obstructing case that had already gone to trial and was set for sentencing. On April 21, 2015, the defendant filed a *pro se* motion for a new trial in the obstructing case. On April 24, 2015, the court held a hearing on the motion to withdraw. During the hearing, defense counsel explained that, as a solo practitioner with other commitments, he did not believe he had sufficient time to properly prepare for the upcoming armed robbery trial, but he was prepared to continue representing the defendant in the obstructing justice case. The State objected to defense counsel's motion to withdraw on the grounds that appointing new defense counsel for the armed robbery case and giving that attorney adequate time to come up to speed on the case would cause a long delay that would prejudice the State. The court agreed with the State and denied the motion to withdraw but did grant defense counsel additional time to prepare in light of the reason for the motion to withdraw. The court also declined to rule on the *pro se* motion for a new trial in the obstructing case, informing defense counsel he would need to review and amend the motion as necessary.

¶ 27    On May 19, 2015, a sentencing hearing was held in the obstructing case. At the hearing, the defense counsel was granted an extension of time to file an amended motion for a new trial

12

due to a delay in obtaining trial transcripts. The court then conducted the sentencing hearing, at the conclusion of which, the court sentenced the defendant to six years in the Illinois Department of Corrections, followed by a period of one-year mandatory supervised release. The court then admonished the defendant as to his appeal rights.

¶ 28    On July 1, 2015, defense counsel filed his amended motion for a new trial, which was heard by the court on August 6, 2015. The motion for a new trial was ultimately denied in its entirety by the court. On September 3, 2015, a notice of appeal was filed with the trial court in the obstruction case in Illinois Appellate Court, Fifth District, case No. 5-15-0393.

¶ 29    On March 14, 2016, the jury trial on the armed robbery case began. Following a four-day jury trial, the defendant was found guilty of armed robbery and unlawful possession of a weapon by a felon. He was found not guilty on the count of aggravated discharge of a firearm. On April 15, 2016, the defendant filed a motion for a new trial. On April 27, 2016, a sentencing hearing was held, at which the court also heard the defendant's pending motion for a new trial. The court denied the motion for a new trial and sentenced the defendant to a total of 45 years to be served consecutive to the obstruction case. The defendant was then admonished of his appeal rights in the armed robbery case. On April 27, 2016, notice of appeal was filed in the Illinois Appellate Court, Fifth District, in case No. 5-16-0182.

¶ 30    On November 26, 2018, this court entered orders remanding both cases to the trial court. See *People v. Perkins*, 2018 IL App (5th) 150393-U; *People v. Perkins*, 2018 IL App (5th) 160182-U. In the appeal on the obstruction case, we remanded to allow the trial court to conduct a *Krankel* inquiry into whether defense counsel provided ineffective assistance. In the appeal on the armed robbery case, we remanded for the limited purpose of allowing the trial court to reconsider its

13

denial of defense counsel's motion to withdraw should it be necessary following its *Krankel* inquiry in the obstruction case.

¶ 31    On March 11, 2019, the trial court appointed William Hoffeditz to serve as appointed counsel and handle the remanded matters, including the *Krankel* inquiry. Following several continuances, on January 14, 2021, the trial court held a hearing on the defendant's claim of ineffective assistance of counsel. The hearing began with a discussion of what was to happen, with the court explaining that it had skipped the initial inquiry and appointed *Krankel* counsel, and that the court's plan was to hold one hearing where the court would hear the ineffective assistance arguments in the obstructing justice case, then, in light of those arguments, reconsider its motion denying trial counsel leave to withdraw in the armed robbery case.

¶ 32    *Krankel* counsel began its case by calling the defendant's trial counsel to testify as to his representation of the defendant. The examination began with the defendant waiving attorney-client privilege with regard to issues before the court. After doing so, the defendant's trial counsel testified that he had been a solo practitioner and had petitioned the court to allow his withdraw from the armed robbery case because of other obligations. He further testified that he had never felt unable to give the obstruction case his full attention. Trial counsel also testified that the defendant chose not to testify after consulting him and that it was the defendant's decision. Next, trial counsel testified that in regard to the armed robbery case, the defendant had not informed him of the specifics of the defendant's proposed Walmart alibi (that he interacted with store employees because a self-checkout machine was broken, such that someone may remember him). Instead, trial counsel testified that the defendant had only informed him that he had been at Walmart, and that Walmart had told him that surveillance footage from that date was unavailable when it was requested. Additionally, trial counsel testified that, even though he had requested to withdraw from

14

the armed robbery case, once he was ordered to remain on the case, he was able to adequately concentrate on the defendant's defense. Finally, trial counsel testified that he reviewed the evidence in the case with the defendant, including the phone calls, and that the defendant did not request to review any other evidence.

¶ 33    Following trial counsel's testimony, *Krankel* counsel called the defendant to testify. The defendant testified that he had wanted to testify at both trials but was prevented from doing so by his trial counsel. He further testified that he had requested to hear the phone calls, but that they were never played for him. Finally, he testified that he provided specifics about the broken self-checkout machine to trial counsel but was unsure that trial counsel ever did anything with that information.

¶ 34    On March 23, 2023, the trial court entered an order regarding the matters on appellate remand. In that order, the trial court found trial counsel's testimony credible and subsequently found that the defendant's trial counsel had provided effective assistance in regard to the obstruction of justice case. Additionally, the trial court found that, in light of its finding that trial counsel had provided effective assistance in the obstruction case, it had not erred in denying trial counsel's motion to withdraw in the armed robbery case.

¶ 35    On April 13, 2023, the defendant filed his notice of appeal in both cases with the trial court. On April 24, 2023, the defendant filed amended notices of appeal. The appeal from the armed robbery case was assigned as Illinois Appellate Court, Fifth District, case No. 5-23-0251. The appeal from the obstruction of justice case was assigned as Illinois Appellate Court, Fifth District, case No. 5-23-0252. On March 21, 2024, the defendant filed a motion to consolidate both appeals into one case. The motion to consolidate was granted by this court on March 25, 2024, and both appeals were consolidated into Illinois Appellate Court, Fifth District, case No. 5-23-0251.

15

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, the defendant's first claim of error is that the State failed to present sufficient evidence to prove him guilty beyond a reasonable doubt. The defendant's second claim of error is that the trial court erred in permitting the jury to hear Deputy Sanford's "unnamed witness" hearsay statements, as the course of investigation hearsay exception was not applicable to them. The defendant's third claim of error is that the trial court erred when it permitted Pollard to testify as to Finley's statements to him, as the statements of a co-conspirator hearsay exception would not apply to them. The defendant's fourth argument on appeal is that the trial court erred when it permitted the State to introduce evidence that the defendant's house was on fire when Deputy Furlong arrived because it was unfairly prejudicial and should have been excluded as other crimes or bad acts evidence. The defendant's fifth argument on appeal is that the trial court erred in permitting the State to impeach Finley with a prior inconsistent statement. The defendant's sixth and final argument on appeal is that his *Krankel* counsel provided ineffective assistance on remand by failing to properly investigate his claims of ineffective assistance of trial counsel and by failing to submit affidavits in support of those claims. We will address each of these arguments in turn.

¶ 38                    A. Sufficiency of Evidence to Prove Obstruction of Justice

¶ 39    On appeal, the defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of obstruction of justice. To sustain a conviction for the offense of obstruction of justice, the State needed to prove that (1) the defendant, or one for whose conduct he is legally responsible, knowingly concealed physical evidence and (2) the defendant, or one for whose conduct he is legally responsible, did so with intent to obstruct the prosecution of the defendant. 720 ILCS 5/31-4(a)(1) (West 2012).

16

¶ 40 When a defendant makes a claim that there was insufficient evidence to sustain his conviction, this court reviews the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which the defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409, 416 (2007). We will not reverse a criminal conviction unless the evidence presented at trial is so improbable or unsatisfactory as to justify a reasonable doubt as to the guilt of the defendant. *Id.* We allow all reasonable inferences from the record in favor of the prosecution, whether the evidence in the case is direct or circumstantial. *Id.* Circumstantial evidence alone, if it satisfactorily proves the elements of the offense beyond a reasonable doubt, will sustain a criminal conviction. *People v. Jackson*, 2020 IL 124112, ¶ 64.

¶ 41 There is no requirement that this court disregard inferences that flow from the evidence, or that this court search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt. *Saxon*, 374 Ill. App. 3d at 416-17. We do not retry the defendant, instead leaving it to the trier of fact to judge the credibility of witnesses, resolve conflicts in the evidence, and draw reasonable inferences based upon all of the evidence properly before the trier of fact. *Id.* at 416.

¶ 42 In this case, the defendant asserts that the State failed to present sufficient evidence to show that the shotgun recovered from the pond was the same shotgun used in the armed robbery for three main reasons. First, the defendant argues that Pollard, the State's witness to both crimes, was unreliable as a witness, and that he repeatedly identified the shotgun used in the robbery as a pump-style shotgun, while the shotgun recovered from the pond was a breach-style shotgun. Second, the defendant argues that Buffington, the person alleged to have had a shotgun during the armed robbery, had a pump-style shotgun matching Pollard's initial description at his residence, casting

17

doubt that the shotgun the State says he intended to hide was the shotgun from the armed robbery. Finally, the defendant argues that the State could have better proven its case by introducing additional evidence, such as other witness testimony or forensic evidence, but chose not to do so.

¶ 43    In response, the State argues that a mere conflict in trial testimony is not sufficient to establish a reasonable doubt as to the defendant's innocence, as a single witness's testimony is sufficient to convict a defendant, even if contradictory testimony is given or the defendant asserts the witness is not credible. The State therefore argues that the evidence that was presented at trial, including Pollard's testimony and the evidence about the phone call directing Finley to the shotgun, was sufficient to find that the defendant was guilty of obstruction of justice beyond a reasonable doubt for his role in disposing of the shotgun in the pond.

¶ 44    In reply, the defendant maintains that the State failed to prove him guilty beyond a reasonable doubt and reiterates that the evidence was insufficient. He further reiterates that the State's case rests almost entirely on Pollard's testimony, whose credibility the defendant argues is suspect due to his prior statements regarding the type of shotgun changing. The defendant further contends that the State's assertion that the jail phone call audio links the defendant to the disposal of the shotgun fails to prove that the shotgun was "material evidence" in the robbery prosecution. The defendant further emphasizes that there was no evidence at trial that linked the shotgun to the armed robbery, and therefore, it was not obstructing justice to get rid of it.

¶ 45    Viewing the evidence in the light most favorable to the State, we conclude the evidence was sufficient for a rational jury to find the defendant guilty beyond a reasonable doubt. First, there was evidence linking the shotgun that was recovered from the chicken ranch pond to the armed robbery. Testimony from Finley established that her motivation for disposing of the items was her belief that "it might have something to do with a criminal case involving a few people that I know."

18

Testimony from Pollard established that the shotgun recovered by the dive team was the same shotgun (or an identical one to the one) that he and Finley had thrown into the lake weeks earlier. Additionally, Pollard testified that the shotgun was the same shotgun (or an identical one to the one) that he had seen during the armed robbery.

¶ 46    The defendant argues that Pollard was unreliable as his statements in the case wavered between whether the shotgun was a breach-action shotgun or a pump-action shotgun, and that he had an interest in testifying the way he did due to his own pending criminal cases. We note, however, that Pollard also testified he was unfamiliar with firearms and never wavered in his description of the shotgun as "sawed off." Here, it is clear from the record that the jury had sufficient information to find that the shotgun recovered from the pond could be evidence in the armed robbery case.

¶ 47    Second, the evidence further showed that the defendant was a part of the effort to hide the shotgun from law enforcement. Pollard testified at trial that Finley's stated reason for seeking to dispose of the shotgun was that she was informed as to its location by the defendant, and he had instructed her to dispose of it over the phone. Finley, meanwhile, testified that she found the shotgun on her own and denied anyone directing her to dispose of it.

¶ 48    The State also introduced evidence of recorded jail phone calls made in the dayroom where the defendant was located, and on a phone to which no other inmate had access. The State introduced evidence that even though the account the calls were made from belonged to another inmate, the voices on the phone call and the contents of the call are enough to establish that the parties to the phone call were the defendant and Finley. Further, the contents of the calls appeared to direct Finley to locate and dispose of something. While the defendant contends that "something"

19

is unknown, we find it is the providence of the jury to determine if the "unknown something" was the shotgun from the armed robbery.

¶ 49    While the defendant does point to conflicting evidence in parts of the State's case against him, the jury was entitled to resolve credibility issues in the State's favor, as the weight to be given to a witness's testimony, the credibility of that witness, the resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Additionally, where evidence is merely conflicting, a court of review will not substitute its judgment for that of a jury. *People v. Akis*, 63 Ill. 2d 296, 298-99 (1976).

¶ 50    Although Pollard had potential motives to testify favorably for the State, and his statements regarding the type of shotgun changed over time, the jurors were aware of those factors and were entitled to credit his testimony if they so chose. Additionally, the jury was not required to accept as true, as it apparently did not, the defendant's assertion that the shotgun used in the armed robbery was the shotgun recovered from Buffington's house. Further, the jury was entitled to determine who the parties were to the phone call, and what the "something" was that was requested to be disposed of. Finally, we again note it is not the role of a reviewing court to substitute its judgment for that of the jury on issues of witness credibility.

¶ 51    Taken together, the circumstantial, physical, and testimonial evidence established that the defendant knowingly obstructed the investigation into the armed robbery by facilitating the disposal of the shotgun that was found in the lake. Accordingly, the evidence was sufficient to support the convictions, and no basis exists to disturb the jury's verdict.

¶ 52        B. Admissibility of Deputy Sanford's "Unnamed Witness" Testimony

¶ 53    The defendant's second argument on appeal is that Deputy Sanford's testimony about an unnamed witness's statement was inadmissible and that its admission violated his constitutional confrontation clause rights. The defendant breaks this argument into three parts.

¶ 54                1. *Admissibility of Deputy Sanford's Testimony*

¶ 55    First, the defendant argues that Sanford's testimony about an unidentified witness's statement was inadmissible hearsay. Specifically, the defendant argues that the "course of investigation" exception to the hearsay rule did not apply to the following line of questioning:

> "Q. Exhibit 4 was recovered from the pond, is that correct, the gun?
> A. The gun was recovered from the pond, yes.
> Q. What, if any, significance was that weapon with regards to any of your investigation?
> A. The sawed-off shotgun was described to—
> MR. GLENN [(DEFENSE COUNSEL)]: I'm going to object to any hearsay.
> MR. MATOUSH [(ASSISTANT STATE'S ATTORNEY)]: It's not being offered for the truth of the matter. It's the course of the investigation. It's actions.
> THE COURT: I'm going to permit it. The indication is, and I agree, that it's not going towards the truth of the matter asserted therein, but it's only for in furtherance of why the deputy did what he did next. So I'll permit it for that purpose. If the answer exceeds that, then I'll reconsider. You may answer.
> A. The sawed-off shotgun was described to law enforcement as having been used in an armed robbery.
> Q. And was—and what was the description of that sawed-off shotgun, if you know?
> A. One description given to law enforcement was a breech style—a breech style type sawed-off shotgun.
> Q. And what does that mean?
> A. If I may hold up my hands. Breech meaning when it opens, it opens in the middle. It bends down like this.
> MR. GLENN: I'm going to renew my objection. I think we're getting into hearsay now."

¶ 56    The defendant contends that the questioning about the significance of the recovered shotgun does not relate to any investigative course of conduct, because the State did not ask about any steps Deputy Sanford took after locating the shotgun, and Deputy Sanford had already

21

described the investigation up to that point. Instead, the defendant argues that the testimony was used to bolster Pollard's impeached testimony.

¶ 57   The State responds, arguing first that the defendant failed to properly object to the testimony timely, and therefore, the issue is forfeited. Second, the State argues that if the issue is not forfeited, the testimony fits within the course of investigation hearsay exception to the rule because it shows the conclusion of the investigation and explains the chain of evidence issues. Finally, the State argues that if the course of investigation exception did not apply, it was harmless error admitting the testimony, which the defendant argues is proof that it was not necessary to admit the course of investigation testimony because the jury already understood what was going on, and therefore the statements were improper bolstering.

¶ 58   We begin our analysis by noting that we review a trial court's evidentiary rulings under the highly deferential abuse of discretion standard. *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 36. In order to preserve an issue for appeal, a party must make both an objection at trial and maintain that objection in a written posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). An objection to evidence is untimely if not asserted as soon as its ground becomes apparent. *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 52. However, where the ground for an objection does not appear until after the admission of the evidence, the opponent of the evidence should make a motion to strike. *Id.*

¶ 59   In the case before us, the defendant objected on the grounds that the question called for hearsay when the State asked Deputy Sanford, "What, if any, significance was that weapon with regards to any of your investigation?" In response to the objection, the State argued the testimony was needed for course of investigation purposes, and the trial court agreed, overruling the objection on those grounds, noting that the question itself was proper and that the objection may be revisited

22

after the question is answered if it falls outside the scope of the exception. If it became clear that Deputy Sanford's answer to the State's question did not fall within the course of investigation hearsay exception, the defendant's counsel was required to object and make a motion to strike the testimony in order to preserve the issue. Here, the defendant's counsel did not. In addition, the defendant failed to object to the State's next question, "And was—and what was the description of that sawed-off shotgun, if you know?" and failed to make a motion to strike Deputy Sanford's answer to that question after it became clear that it did not fall within the course of investigation hearsay exception either. Additionally, the defendant failed to specifically include this claim in his motion for a new trial; instead, the defendant relies on a general claim that the court had allowed improper hearsay evidence. Thus, we find that the defendant failed to make the required objections or request the required remediation by motion to strike to preserve this issue at trial, and therefore, we find forfeiture of the argument on appeal. See *People v. Sutton*, 316 Ill. App. 3d 874, 893-94 (2000) (the failure to object, together with the general language of the motion for a new trial, constitutes a waiver).

¶ 60                                    2. *Confrontation Clause Claim*

¶ 61    Second, the defendant argues that Deputy Sanford's testimony about an unidentified witness's statement violated his confrontation clause rights. Specifically, the defendant argues that the conclusory nature of the hearsay statement, the omission of a limiting instruction by the court, and the lack of an opportunity to confront the party who made the statement mean that the testimony violated his confrontation clause right to confront his accusers.

¶ 62    In response, the State argues that the defendant's confrontation clause argument is being raised for the first time on appeal, and that therefore the argument is forfeited, as the only objections raised in regard to the admissibility of testimony in the trial court were hearsay

23

objections. In his reply brief, the defendant counters arguing that his confrontation clause argument was preserved under the hearsay objections made before, during, and after the trial.

¶ 63    In evaluating the defendant's claim, we note that we have previously found that when the defendant failed to make the objections or motions to strike required to preserve the hearsay issues at trial, we found forfeiture of the hearsay arguments on appeal. Thus, even assuming, *arguendo*, that the defendant was correct in arguing that a proper hearsay objection would preserve an unraised confrontation clause claim, it would not be applicable here, where there was not a preserved claim of error on hearsay grounds. Therefore, we find the defendant's confrontation clause claim is forfeited on appeal alongside his hearsay claims. See *People v. Eastling*, 386 Ill. App. 3d 884, 887-88 (2008) (a defendant waived confrontation clause challenge by failing to object at trial or raise the issue in his posttrial motion).

¶ 64                                      3. *Harmless or Plain Error*

¶ 65    Third, the defendant argues that the error in admitting the testimony was not harmless. Specifically, the defendant contends that the State cannot claim that the error was harmless beyond a reasonable doubt because the improperly admitted testimony concerned the ultimate issue in the case, whether the recovered shotgun was the one used in the robbery. The defendant further contends that the repetition offered corroboration of an impeached witness's testimony, which gave the testimony undue weight. Finally, the defendant contends that because Deputy Sanford was not excluded under the rule on witnesses, the jury may have given his statements additional credibility that it should not have.

¶ 66    In response, the State argues that if the testimony was not forfeited or properly admitted, it was harmless error. Specifically, the State contends that the jury heard other testimony sufficient to prove its case, arguing that the jury was already aware of conflicting descriptions of the shotgun.

24

Further, the State contends that the testimony at issue was "one description given to law enforcement" and that such a statement implies other descriptions existed, so it did not bolster Pollard's testimony. Additionally, the State contends that Deputy Sanford's cross-examination statements were struck and the jury was admonished not to consider them, so they would not be inadmissible corroboration of the earlier statements. Finally, the State contends that Deputy Sanford being present at the prosecution's table throughout the trial would not have lent Deputy Sanford's testimony more credibility than it otherwise would have received, given his role as the lead investigator on the case, his rank, and his years of law enforcement experience.

¶ 67 We begin our analysis of the parties' harmless-error arguments by noting that the Illinois Supreme Court has stated that in cases where the claim of error is preserved, the harmless-error analysis applies. *People v. Hartfield*, 2022 IL 126729, ¶ 42. Correspondingly, where the claim of error was not preserved, plain-error analysis applies. *Id*. Here, because we found that the defendant forfeited his claims of error by failing to preserve them for appeal, we find that plain-error review applies to our review, and we do not consider the defendant's harmless-error arguments.

¶ 68 In his reply brief, the defendant makes a plain-error argument, realleging his sufficiency argument *supra* in argument number one. Specifically, the defendant contends that the evidence at trial was closely balanced, as noted by his sufficiency argument, and that "[i]f the evidence was insufficient" then "of course the evidence was at a minimum closely balanced." Thus, the defendant contends that regardless of whether we consider the claim under plain error instead of harmless error, we must find that reversible error occurred.

¶ 69 The Illinois Supreme Court has identified two instances when it is appropriate to excuse a defendant's forfeiture of a claim of error and conduct a plain-error review: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to

25

tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445 ¶ 48.

¶ 70 The initial analytical step under either prong of the plain-error doctrine is determining whether there was a clear or obvious error at trial. *Id.* ¶ 49. To that end, assuming *arguendo* that we had previously found that the trial court committed error when it permitted Sanford's testimony about the significance of the shotgun, as well as a description of the shotgun, to be admitted into evidence, the next step under the plain-error doctrine would depend upon the defendant's argument. *Id.* ¶ 50.

¶ 71 Where the defendant claims second-prong plain error, a reviewing court must decide whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process. *Id*. If the defendant carries that burden, prejudice is presumed because of the importance of the right involved. *Id*.

¶ 72 Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice. *Id.* ¶ 51. If the defendant carries that burden, prejudice is not presumed; rather, the error is actually prejudicial. *Id*. In other words, to prevail under first-prong plain error, the defendant must meet his burden to show that the error was prejudicial by proving that the quantum of evidence presented by the State against the defendant rendered the evidence "closely balanced." *Id*.

¶ 73    In the case before us, the defendant argues the first prong of plain error, that the evidence was so closely balanced that the error alone threatened to tip the scales of justice. The defendant then points to his sufficiency argument *supra* to support his claim that the evidence was closely balanced. In doing so, he directs this court's attention to *Sebby*, where we note the Illinois Supreme Court stated, "The issue before us, however, does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *Id.* ¶ 60.

¶ 74    The defendant thereby, in repeating his sufficiency argument, misses the point. While we find sufficient evidence above, here the defendant must argue that the sufficient evidence to prove the defendant guilty was so closely balanced with the evidence of innocence that the complained-of error tipped the scales. To simply state that there was insufficient evidence to convict and therefore the evidence was closely balanced is circular, and if the evidence was insufficient, there would be no need for plain-error review in this case. The defendant instead needs to present his argument for how the sufficient evidence was close, and therefore, how the particular complained-of error tipped the scales against him. The defendant does not make such an argument, and he correspondingly does not meet his burden.

¶ 75    Additionally, we note it is not this court's duty to meet the defendant's burden of proving plain error for him. Instead,

> "[a] reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; it is not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it the obligation of this court to act as an advocate or seek error in the record. [Citation.] Supreme Court Rule 341 requires that the appellant clearly set out the issues raised and the legal support therefor with relevant authority. [Citation.] The consequence of not complying with Supreme Court Rule 341 is

waiver of those issues on appeal. [Citation.] (holding that arguments not supported by relevant authority and coherent legal argument are waived)." *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009).

Therefore, we do not find plain error.

¶ 76                    C. Admissibility of Finley's Statements to Pollard

¶ 77    The defendant's third claim of error on appeal is that Finley's statements to Pollard were not made in furtherance of the conspiracy and therefore were not admissible. Specifically, the defendant contends that the court's allowance of the following testimony was in error:

> "Q. [MR. MATOUSH] Now, during this discussion and these actions, did you inquire as to where the gun was found?
> A. No, sir. Or maybe yes, I did, and she said that—
> MR. GLENN: I'm going to object.
> A. —there was a bunch of trees up the road.
> THE COURT: Wait. Wait. Sir, let me hear the objection, and then we'll see …
> MR. GLENN: I'm going to object to this hearsay, and I'd like to show a continuing objection to that kind of hearsay by somebody that's not here.
> THE COURT: Okay. The Court will note the objection, and the Court is going to overrule the objection, and I will show a continuing objection by Mr. Glenn of any further hearsay testimony of the witness.
> Q. (By Mr. Matoush) Again, if you could finish your answer, sir.
> A. I forgot what the question was.
> Q. Okay. Did Ms. Finley indicate where she had found the gun?
> A. Yeah. She said it was in some trees up by the main road up front there.
> Q. Okay. And when you say up front there, what property would that have been on?
> A. It would have been the Dudley property.
> Q. Did she show you where it was at?
> A. No, sir.
> Q. Did she indicate how she found it?
> MR. GLENN: I'm going to object again.
> THE COURT: Show the same objection, same ruling of the Court.
> Q. (By Mr. Matoush) So that means you can answer that.
> A. Okay. She told me that Mr. Perkins had told her where the gun was and to get rid of it."

¶ 78    The defendant contends that Finley's statements to Pollard, as described above, were merely statements of past facts and did nothing to further Pollard's participation in the conspiracy,

28

as there was no testimony indicating that Pollard requested or needed those details before participating in the conspiracy. The State argues that the statements were made in furtherance of the conspiracy because they facilitated the destruction of evidence from the original crime. In addition, the State argues that, even if the statements were improperly admitted, their admission was harmless beyond a reasonable doubt given the amount of other evidence presented at trial.

¶ 79    We begin our analysis by noting that under the Illinois Rules of Evidence, an out-of-court statement by a co-conspirator of a party during the course and in furtherance of the conspiracy is not hearsay. Ill. R. Evid. 801(d)(2)(E) (eff. Oct. 15, 2015). Further, we review a trial court's evidentiary rulings under the highly deferential abuse of discretion standard. *Caraga*, 2018 IL App (1st) 170123, ¶ 36. Therefore, we will not reverse a ruling on the admissibility of evidence unless the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would agree with it. *Id*.

¶ 80    From the record, it is not clear as to the timeframe the question "[n]ow, during this discussion and these actions" is referring to. Here, one could reasonably conclude that the timeframe the question was referring to was when Finley was recruiting Pollard to assist her in disposing of the evidence in the pond or was otherwise made before the evidence was disposed of. As such, it would not be an abuse of discretion for the court to find that the statement was made in furtherance of the conspiracy in that the statements were made to recruit Pollard, or ensure his continued help, in disposing of the gun. Therefore, we find that the trial court did not abuse its discretion in admitting the testimony.

¶ 81                    D. Admissibility of the Burning Residence

¶ 82    The defendant's fourth argument on appeal is that the trial court erred when it allowed the jury to hear evidence that the defendant's residence was on fire when Deputy Furlong arrived.

29

Specifically, the defendant contends that even though the court barred testimony that Deputy Furlong was there to serve a warrant, the introduction of the house-on-fire evidence had scant probative value while being highly prejudicial, and it should have been excluded as other crimes or bad acts evidence.

¶ 83    The State argues that the testimony that the defendant's residence was burning was not other crimes or bad acts evidence because there is no evidence in the record that the burning residence was the result of a crime or bad acts. In the alternative, the State argues that it would be admissible to show the identities of the people on a phone recording as they reference something having been burned in the call. Finally, the State argues that the invited error doctrine, which says that a party cannot complain of error if he previously consented to the conduct now complained of, means that since the evidence was introduced via stipulation (agreement), the defendant cannot now complain of the consented to course of conduct. In reply, the defendant argues the invited error doctrine does not apply to a defendant following an evidentiary objection being overruled, and that even if the defendant's residence being on fire was not a crime, it still created an inference of wrongdoing and so should be excluded.

¶ 84    Assuming, *arguendo*, that the evidence the State wished to admit was other crimes or bad acts evidence, we note that the rule of invited error or acquiescence is a procedural default sometimes described as estoppel. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented. *Id*. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings. *Id*.

¶ 85 The defendant claims that this doctrine does not apply here, because, as the Illinois Supreme Court stated in *People v. Williams*, "[t]he rule that a party cannot object on appeal to evidence which was introduced by that party does not apply where a motion to exclude the evidence was presented and denied." *People v. Williams*, 161 Ill. 2d 1, 34 (1994). "[I]t is not inconsistent for a defendant to request the exclusion of evidence and, subsequent to the court's denial of that request, to disclose the evidence himself in the hope of lessening its impact upon the jury." *Id*. In arguing that the doctrine does not apply, the defendant directs our attention to *People v. Collins*, 2020 IL App (1st) 181746, where the court held that after the defendant's counsel never acquiesced to the admission of the evidence after its objections before, during, and after trial were overruled, it was not invited error for the attorney to have introduced part of the evidence it was seeking to exclude.

¶ 86 Turning to the case before us, we find that the doctrine of invited error applies. Unlike in *Collins*, where the defendant objected to the introduction of evidence but was ultimately overruled by the court prior to introducing the evidence itself, here it is clear from the record that the defendant did not maintain his objection. Instead, prior to the court ruling on the question of admissibility, the defendant, through his counsel, proposed entering into a stipulation with the State for the introduction of the evidence after the court appeared willing to overrule the objection, but before the court actually issued a ruling. Thus, the defendant, by abandoning his original objection when he proposed the stipulation prior to the court ruling on the objection, cannot now complain of error.

¶ 87 E. Admissibility of Finley's Prior Inconsistent Statement

¶ 88 The defendant's fifth argument on appeal is that the trial court erred when it allowed the State, on redirect examination, to question Finley about a prior inconsistent statement she had

31

made. Specifically, the defendant contends that the trial court erred when it allowed the State, on redirect examination, to impeach Finley using the substance of a statement that was not admitted during either direct examination or cross-examination. Additionally, the defendant contends that the State's question violated the trial court's motion *in limine* requiring a sidebar prior to such questions. The defendant further contends that, although the State withdrew the question involving the exact details of the conversation, the prejudice of the statement was already suffered and made worse by the State's continued questioning of the prior statement.

¶ 89    In response, the State argues that the impeachment of Finley by introducing her prior inconsistent statement was proper, and if it was not, it was harmless error. Specifically, the State contends that the defendant opened the door to Finley's law enforcement interview on cross-examination by eliciting testimony related to her drug use at the time of the interview, as the purpose of the redirect is to address matters raised on cross. The State further contends that the scope of the redirect was within the trial court's discretion.

¶ 90    In reply, the defendant argues that the State failed to prove the testimony was properly admitted and consequently that the State forfeited the harmless-error argument by failing to argue it. Specifically, the defendant contends that prior to impeaching its own witness with a prior inconsistent statement, the State's case had to be affirmatively damaged by Finley's testimony, which the defendant contends it was not. Additionally, the defendant contends that the State could not inquire into the contents of the conversation between Finley and law enforcement, only as to whether or when it occurred, as the defendant only opened the door as to those questions on cross-examination. The defendant further contends that the State's method of impeaching with an inconsistent statement was improper because the State did not first confront Finley with the

32

inconsistency outside the view of the jury. Finally, the defendant contends that the State has forfeited any claim of harmless error by failing to argue or support such a claim in its brief.

¶ 91    This claim of error arises from the following exchange during the State's redirect examination of Finley:

"Q. [MR. MATOUSH] You were questioned in cross examination about this interview. Was that an interview with Sergeant Chris Robinson of the Litchfield Police Department?
A. Yes.
Q. And during that interview, you recalled specifics about that interview, correct?

* * *

A. Yeah.
Q. Okay. Isn't it fair to say that you also told Robinson that Lloyd Perkins called you and told you where the gun was?
MR. GLENN: Your Honor, I think this is improper cross. I'd like to approach the bench or have a sidebar.
THE COURT: Okay.
(A sidebar is held outside the presence of the jury, during which the State agrees to restate the question.)
THE COURT: The question is withdrawn. The State is going to rephrase.

* * *

Q. Do you recall, did you indicate to the police how you found the gun?
MR. GLENN: I'm going to object. I think this is getting into the statement that was not gotten into on my—
THE COURT: Well, he's not asked—he's not asked what the statement is. He's just asking her whether she gave the statement, at least at this point. So I'll show the objection is overruled.
A. Possibly, yes.
Q. (By Matoush) And what—what did you tell them?
MR. GLENN: I'm going to object. Now we're getting into the statement itself, which is something I did not get into was that prior statement, the substance of it. I did not bring that up in my cross.
THE COURT: So his objection is it's beyond the scope.
MR. MATOUSH: But he brought up the interview in his cross.
THE COURT: I'm going to permit it and show the defendant asked questions specifically with regard to the police interview, brought the interview to the attention of the Court, and has then opened the door with regard to the questions to be asked.

***

THE COURT: Go ahead.
MR. GLENN: I'd like to show a continuing objection then.

33

THE COURT: The record will reflect a continuing objection with regard to questions the State is going to ask with regard to Ms. Finley's recollection of this interview.

Q. (By Mr. Matoush) What did you tell the police?

A. I don't remember.

Q. You can't remember those details?

A. I'm not sure."

¶ 92 Whether a prior statement is inconsistent under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2012)) and, therefore, admissible as substantive evidence, falls within the sound discretion of the trial court, and the decision will be reversed on appeal only if it constitutes an abuse of discretion. *People v. Harvey*, 366 Ill. App. 3d 910, 922 (2006). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 93 Generally, hearsay refers to "an out of court statement *** offered to establish the truth of the matter asserted." (Internal quotation marks omitted.) *People v. Gonzalez*, 379 Ill. App. 3d 941, 954 (2008). As an exception, the prior inconsistent statements of a testifying witness may be admitted to impeach the witness's credibility. *People v. McCarter*, 385 Ill. App. 3d 919, 932 (2008). Additionally, section 115-10.1 of the Code provides that a prior inconsistent statement may be offered not just for purposes of impeachment, but as substantive evidence, if:

"(a) the statement is inconsistent with his testimony at the hearing or trial, and

(b) the witness is subject to cross-examination concerning the statement, and

(c) the statement—

(1) was made under oath at a trial, hearing, or other proceeding, or

(2) narrates, describes, or explains an event or condition of which the witness had personal knowledge, and

34

(A) the statement is proved to have been written or signed by the witness, or

(B) the witness acknowledged under oath the making of the statement either in his testimony at the hearing or trial in which the admission into evidence of the prior statement is being sought, or at a trial hearing, or other proceeding, or

(C) the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." 725 ILCS 5/115-10.1 (West 2012).

¶ 94 When a prior inconsistent statement meets the basic requirements of reliability under section 115-10.1 of the Code, either party in a criminal case may introduce the prior inconsistent statement as substantive evidence. See *People v. Santiago*, 409 Ill. App. 3d 927, 932-33 (2011). Section 115-10.1 seeks to advance the legislature's goal of "prevent[ing] a 'turncoat witness' from merely denying an earlier statement when that statement was made under circumstances indicating it was likely to be true." *People v. Thomas*, 354 Ill. App. 3d 868, 882 (2004).

¶ 95 Here, we note that the statement does not meet the criteria for admission as substantive evidence, because Finley did not, at any point in the record, acknowledge under oath to making the statement as required in subsection (B). 725 ILCS 5/115-10.1(c)(2)(B) (West 2012). Additionally, the prior inconsistent statement does not meet the requirements of having been made in writing or in a document signed by Finley under subsection (A), nor was it recorded under subsection (C). *Id.* § 115-10.1(c)(2)(A), (B).

¶ 96 However, even if a prior inconsistent statement is not admissible as substantive evidence, it may still be admissible for purposes of impeachment. *Id.* § 115-10.1 (nothing in this section shall

render a prior inconsistent statement inadmissible for purposes of impeachment because such statement was not recorded or otherwise fails to meet the criteria set forth herein). When a prior inconsistent statement is not admissible as substantive evidence, and the statement is incriminating to the defendant, that statement can only be used for impeachment when the testimony of that witness does "affirmative damage" to the State's case. *People v. Cruz*, 162 Ill. 2d 314, 361-62 (1994) (citing *People v. Bradford*, 106 Ill. 2d 492, 500 (1985)).

¶ 97    Illinois courts have held that to do affirmative damage, the statement must do "more than merely disappoint the State by failing to incriminate defendant." *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 44. Instead, "the testimony must give 'positive aid' to the defendant's case." *Id*. One way that the inconsistent testimony could give positive aid to the defendant's case is "by being inconsistent with the defendant's guilt under the State's theory of the case." *McCarter*, 385 Ill. App. 3d at 933. "It is only when the witness' testimony is more damaging than his [or her] complete failure to testify would have been that impeachment is useful." *People v. Sims*, 285 Ill. App. 3d 598, 610 (1996) (citing *People v. Weaver*, 92 Ill. 2d 545, 563-64 (1982)). A witness's professed "lack of memory" standing alone does not affirmatively damage the State's case for the purpose of impeaching its own witness. *People v. Brothers*, 2015 IL App (4th) 130644, ¶ 73.

¶ 98    Thus, in order for the testimony to be admissible in the present case, on direct examination, Finley's testimony had to affirmatively damage the State's case. During direct examination, when Finley was first questioned about how she found the shotgun, she testified that she did not remember. Standing alone, that testimony would not have been enough to subject Finley to impeachment by the introduction of a prior inconsistent statement. However, later in her direct testimony, she testified that no one had requested that she dispose of the shotgun, and she further testified that she never had a conversation with the defendant concerning a gun.

¶ 99    In order to prove the defendant participated in the obstruction of the armed robbery investigation, the State had to prove that he had directed the disposal of the shotgun. Finley's testimony at trial, that no one asked her to dispose of the shotgun and that she never discussed a gun with the defendant, if taken as true by the jury, would disprove the State's case, thus, affirmatively damaging it. On redirect examination, the prior statement the State attempted to introduce was Finley's admission that she had discussed the shotgun with the defendant, which is testimony that is contradictory to the damaging testimony at trial. Therefore, we find that the State could, regardless of whether the statement was substantively admissible, introduce prior inconsistent statements for the purpose of impeaching Finley's testimony at trial relating to her denial that she discussed the shotgun with the defendant.

¶ 100    The defendant's next contention is that the prior inconsistent testimony introduced at trial fell outside the scope of cross-examination, and thus, even if it qualified as proper impeachment, it was still beyond the permissible scope of cross-examination, and therefore inadmissible on redirect examination. In support of his contention, the defendant directs this court to *People v. Garner*, 91 Ill. App. 2d 7 (1968).

¶ 101    In *Garner*, the State called a witness, and at the conclusion of cross-examination of that witness, the defense asked, " 'Now before testifying today, have you talked to anybody about this case?' " *Id.* at 13. The witness responded, " 'Naturally, it's something you talk about.' " *Id.* Following the witness's answer, the court then questioned the witness regarding the details of those conversations, including who they were with, when they were had, and what was said. *Id.* at 13, 14. On appeal, the Second District found that the circuit court "abused its discretion in interrogating the witness relative to the substance of her conversation with [the witnesses]," but

held that the error was harmless even though it exceeded the scope of the preceding cross-examination. *Id.* at 16.

¶ 102   However, we note that, as the State points out, in *People v. Johnson*, 2018 IL App (5th) 150274, ¶ 65, we held that the latitude allowed during cross-examination and redirect is a matter within the discretion of the trial court, and we will not reverse that decision unless there was a clear abuse of discretion resulting in manifest prejudice to the defendant. Further, we note that the Illinois Supreme Court, in *City of Springfield v. Dalby*, 139 Ill. 34, 38 (1891), has gone so far as to state:

> "While, ordinarily, the re-examination of a witness by the counsel producing him should be confined to matters called out on cross-examination, it is clearly within the discretion of the court to permit questions to be put to him touching new matters, and the exercise of such discretion will not ordinarily be reviewed on appeal."

Accord *People v. Rojas*, 359 Ill. App. 3d 392, 404 (2005) (citing *Dalby*).

¶ 103   Here, on cross-examination, the defendant introduced testimony that at the time Finley was arrested on July 29, 2014, she gave a statement to police. She further testified that at the time she made the statement, she had taken drugs. Defense counsel did not cross-examine Finley as to the contents of any of her statements. On redirect, the State inquired into the contents of Finley's statement to police for the purpose of introducing her prior inconsistent statements as impeachment to her earlier testimony. We find that the trial court did not abuse its discretion in determining that this line of questioning was permissible, as it had discretion over the scope of the redirect and to permit questioning beyond the scope of cross-examination. Under an abuse of discretion standard, this court will not substitute its judgment for that of the trial court. *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 700 (2009).

38

¶ 104 Finally, the defendant argues that the State used an improper procedure to impeach Finley. Specifically, the defendant contends that the State was required by *People v. Brothers*, 2015 IL App (4th) 130644, to first confront Finley with the inconsistent statement outside the presence of the jury in case she denied making the statement. *Id.* ¶¶ 72-74. We note, however, that this procedure was not required by the court, but was instead given as best practice. *Id.* ¶ 74. Additionally, the concerns this procedure is meant to address relate to prejudice if the inconsistent statement is denied on the stand, which is not relevant where the inconsistent statement is used for impeachment purposes rather than substantive ones. Therefore, we find there were no procedural errors in the admission of the impeachment testimony.

¶ 105          F. Defendant's Claim of Ineffective Assistance of *Krankel* Counsel

¶ 106 The defendant's sixth and final argument on appeal is that the defendant's appointed *Krankel* counsel on remand provided ineffective assistance by failing to support the defendant's claims that his trial counsel provided ineffective assistance with evidence. Specifically, the defendant contends that on previous remand, *Krankel* counsel provided deficient representation because he failed to develop or present supporting evidence for two of the defendant's claims of error related to his trial counsel. First, the defendant contends that *Krankel* counsel failed to further investigate and secure statements or witnesses related to the defendant's Walmart alibi in the armed robbery case. Second, the defendant contends that *Krankel* counsel failed to further investigate and secure "the jail records" that the defendant claims would show trial counsel failed to review the recorded jail calls with him prior to trial in the obstruction case. Finally, the defendant argues that if counsel was deficient for failing to investigate the defendant's claims, the record is insufficient to make a determination as to the prejudice prong of *Strickland v. Washington*, 466 U.S. 668

(1984), as there was no record for us to rule on, and therefore we must remand the case upon a showing of deficiency.

¶ 107   In response, the State argues that both trial counsel and *Krankel* counsel provided effective assistance, and therefore the defendant cannot prevail. Specifically, the State contends that *Krankel* counsel was not required to submit affidavits or records to support his arguments related to trial counsel's ineffectiveness because this is not a Post-Conviction Hearing Act case where such is required by statute. Additionally, the State contends that trial counsel was not ineffective because he testified that the defendant failed to inform him of the full details of the Walmart alibi, and even if he had, it would not have been a defense in the obstruction case before the court. Further, the State contends that the jail records that the defendant argues *Krankel* counsel should have obtained would only show that trial counsel visited the defendant, as trial counsel claimed he did, and would not have been helpful to the court. The State also contends that the defendant's decision not to testify was his own and comported with the defendant's strategy at trial of disputing that he was a party to the phone call by not allowing the jury to hear his voice.

¶ 108   In his reply brief, the defendant contends that the postconviction requirement that evidence be attached to the petition to support the defendant's claims should be applied to this case. Additionally, the defendant contends that the Walmart alibi is relevant, as the court conducted *Krankel* inquiries on both issues on remand. If he had an alibi for the armed robbery, then he would not have needed to obstruct the investigation into it. Further, the defendant contends that the jail records would have shown whether defense counsel brought a copy of the jail phone calls at issue in the case. Finally, the defendant argues that the State concedes that further evidentiary hearings are required to determine if *Krankel* counsel provided effective assistance by failing to argue that it is not required.

¶ 109   As it has developed, a *Krankel* inquiry proceeds in two stages. In the first stage, the trial court examines the factual bases of the defendant's *pro se* claims of ineffective assistance of trial counsel. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 43 (citing *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003)). If, in this preliminary inquiry, the trial court determines that the claims lack merit or pertain only to matters of trial strategy, then it need not appoint new counsel and may deny the defendant's *pro se* motion. *Id*. If, however, the claims show possible neglect on trial counsel's part, the trial court will appoint new counsel. *Id*. Following the appointment of new counsel (*i.e.*, *Krankel* counsel), the matter proceeds to the second stage of the *Krankel* inquiry. *Id*. The second stage consists of an adversarial and evidentiary hearing on the defendant's claims, during which the defendant is represented by *Krankel* counsel. *Id*.

¶ 110   *Krankel* counsel's performance must meet the standard set forth in *Strickland*, which is the same standard that trial counsel must meet. *Downs*, 2017 IL App (2d) 121156-C. Under *Strickland*, to demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 687). Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim. *Id.*

¶ 111   Here, the defendant contends that *Krankel* counsel was ineffective for failing to investigate and submit evidentiary affidavits proving the defendant's two claims of error related to his trial counsel. Turning first to the question of whether *Krankel* counsel failed to investigate, the defendant points to the fact that his *Krankel* counsel failed to file any affidavits or records to

41

support the defendant's claims of error as proof that *Krankel* counsel failed to investigate his claims.

¶ 112    Therefore, we begin our analysis by evaluating the defendant's claim that *Krankel* counsel should have been required to submit affidavits to support the defendant's claims of error. In support of his contention, the defendant does not cite to any case that states that the submission of affidavits is a requirement for *Krankel* counsel on a direct appeal. Instead, the defendant appears to create this requirement by attaching the Post-Conviction Hearing Act requirement that all claims under the act be supported by attached affidavits, records, and other evidence (725 ILCS 5/122-2 (West 2024)) to all claims of ineffective assistance of counsel, whether or not they are brought under the act. The defendant does so under a theory that, because postconviction counsel is only required to provide a reasonable level of assistance (*People v. Suarez*, 224 Ill. 2d 37 (2007)), but direct appeal *Krankel* counsel is required to provide effective assistance of counsel, direct appeal *Krankel* counsel must also submit affidavits and evidence since he is required to provide a higher level of assistance.

¶ 113    While it is an interesting argument, we find no support for it in the case law or statutory law, and we decline to extend a statutory requirement under the Post-Conviction Hearing Act to all direct appeal claims of ineffective assistance of counsel. Accordingly, we find that *Krankel* counsel was not ineffective for failing to provide affidavits or jail logs at the hearing as the defendant contends, as we find that the failure to present these items does not *per se* indicate that *Krankel* counsel failed to investigate the defendant's claims. Because the defendant predicated his argument that *Krankel* counsel failed to investigate his claims on a lack of filing affidavits, we find that the defendant has not met his burden to show that *Krankel* counsel fell below the objective standard of reasonableness by failing to investigate.

42

¶ 114 However, even setting aside the fact that the defendant does not appear to argue it, his *Krankel* counsel's actions at the hearing suggest that *Krankel* counsel investigated the defendant's claims. *Krankel* counsel presented evidence related to the defendant's claims in the form of testimony at the hearing. During the hearing, *Krankel* counsel examined the defendant's trial counsel as to why the defendant did not testify at trial, with trial counsel explaining that the decision not to testify was the defendant's decision. Additionally, the defendant's *Krankel* counsel questioned the defendant's trial counsel as to the defendant's Walmart alibi, with trial counsel denying that the defendant had informed him of the specifics of the broken self-checkout. *Krankel* counsel further examined trial counsel as to the recordings of the jail phone calls, with trial counsel stating that he had reviewed the discovery with the defendant. Looking at the evidence in the record, we find sufficient evidence that the defendant's *Krankel* counsel investigated the defendant's claims and presented evidence as to them during the hearing. Therefore, we do not find that *Krankel* counsel was ineffective.

¶ 115                                   III. CONCLUSION

¶ 116 We find (1) that the evidence at trial was sufficient to support the defendant's conviction; (2) that the defendant failed to preserve evidentiary objections related to Deputy Sanford's testimony at trial, and failed to prove plain error regarding its admission; (3) that the trial court properly allowed Finley's statements to Pollard into evidence as statements of a co-conspirator; (4) that the defendant agreed to the admission of the burning residence by stipulation and cannot now claim error; (5) that the trial court properly permitted the impeachment of Finley by prior inconsistent statement during redirect examination; and (6) that the defendant's *Krankel* counsel on remand was not ineffective for failing to submit affidavits during the *Krankel* hearing, and that

43

he adequately investigated the defendant's claims. Accordingly, we affirm the judgment of the circuit court.

¶ 117   Affirmed.